IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:12-CV-136-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| $307,970.00 IN U.S. CURRENCY, | ) | |
| | ) | |
| Defendant, | ) | |

This matter is before the court on plaintiff's motion for summary judgment, filed by defendant September 26, 2018 (DE 217).[1]  The issues raised have been fully briefed by the parties, and in this posture are ripe for ruling.  For the reasons that follow, plaintiff's motion for summary judgment is denied.

**STATEMENT OF THE CASE**

This case has a lengthy and contentious history that is summarized more fully in the court's prior orders.  The court herein summarizes the history pertinent to disposition of the instant motion.

The government initiated this civil forfeiture action on July 12, 2012, by filing a complaint for forfeiture in rem against $307,970.00 in U.S. currency to enforce 21 U.S.C. § 881(a)(6), asserting that the defendant property was used or intended to be used in exchange for controlled substances, represented proceeds of trafficking in controlled substances, or was used or intended to be used to

---

[1] Also pending before the court are claimants Sirila Pineda Garcia, Lucia Yasmin Covarrubias, and Apolinar Garcia-Ancelmo's (collectively "claimants") Daubert motions and motions in limine (DE 215, 216), and plaintiff's Daubert motion (DE 240).  The court does not address these evidentiary motions at this time, as resolution of the motions is not necessary to dispose of plaintiff's motion for summary judgment for the reasons discussed below.

facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. §§ 801 et seq. The currency was arrested by warrant.

On July 31, 2012, the government filed an amended complaint, (DE 4), correcting an allegation as to where the defendant funds were seized. On August 20, 2012, claimants Cirila Garcia ("Garcia") and Lucia Covarrubias ("Covarrubias") filed claims alleging ownership and possessory interest in defendant funds. (DE 7, 8). On August 29, 2012, claimant Apolinar Garcia-Ancelmo ("Garcia-Ancelmo") filed his claim, (DE 11), also alleging an ownership and possessory interest in the funds. A lengthy period of discovery, interspersed with various stays of the case, followed.

On September 26, 2018, plaintiff filed the instant motion for summary judgment. Plaintiff argues that no reasonable jury could return a verdict for claimants because of the circumstantial evidence showing the money was being used for money laundering; claimant Garcia-Ancelmo's alleged prior history dealing drugs; the expert opinions of law enforcement agents regarding the manner and packaging of currency and the profile of drug couriers; financial records showing lack of adequate income accrued by claimants; and claimants' inconsistent testimony about the source of the seized currency. In support of plaintiff's motion, plaintiff attaches a statement of material facts and appendix of exhibits, including declarations by Gilbert Trillo ("Trillo Decl." (DE 220-1)) and Matthew Miller ("Miller Decl." (DE 220-2)); claimants' responses to plaintiff's interrogatories ("Interrogatory Responses" (DE 220-3); "Covarrubias Special Interrogatory Responses" (DE 220-12); "Supplemental Interrogatory Responses" (DE 220-13)); and depositions of Gilbert Trillo ("Trillo Dep." (DE 220-4, 220-5)), Cirila Garcia ("Garcia Dep." (DE 220-6)), Lucia Covarrubias ("Covarrubias Dep." (DE 220-7)), Thurman Ray Bohne ("Bohne Dep." (DE 220-8)), Hilaria Rodriguez ("Rodriguez Dep." (DE 220-9)), Shannon Titch ("Titch Dep." (DE 220-10)), and Matthew Miller ("Miller Dep." (DE 220-11)).

Claimants responded in opposition to the motion on October 23, 2018. Claimants argue that summary judgment should be denied because the government asks the court to make an impermissible inference in the face of direct testimony by claimants about the purpose of the money being delivered; claimants' involvement with selling drugs is a disputed fact; plaintiff asks the court to draw impermissible inferences about the meaning of coded language, plaintiff asks the court to draw an impermissible inference in favor of the government's witnesses; plaintiff asks for an impermissible inference in its favor and to credit the officers' opinion over claimants' direct evidence; plaintiff argues that claimants' testimony was that they saved money over many years; and claimant Garcia-Ancelmo's reaction to being stopped with the cash was not because the money was being used for drug transactions. Claimants also object to Officer Miller's expert testimony as to currency denominations in drug trafficking, Sharon Titch's opinions on claimants' finances, and Special Agent Trillo's expert testimony as to the coded meaning of "comida para los caballos" at summary judgment.

In support of claimants' response, claimants submit a statement of material facts and several exhibits, including deposition testimony of Justo Urena ("Urena Dep." (DE 233-1)), Cirila Garcia ("Garcia Dep." (DE 233-4)), Lucia Covarrubias ("Covarrubias Dep." (DE 233-5)), Gilbert Trillo ("Trillo Dep." (DE 234-1)), Heather Ross, Ph.D. ("Ross Dep. (DE 234-6)), Thurman Bohne ("Bohne Dep." (DE 234-8)), Hilaria Rodriguez (DE 235-2)), Matthew Miller ("Miller Dep." (DE 235-5)), Brian Fleming ("Fleming Dep." (DE 235-7)), and Sharon Titch ("Titch Dep." (DE 235-8)); declarations by Garcia-Ancelmo ("Garcia-Ancelmo Decl." (DE 233-3)) and Cirila Garcia ("Garcia Decl." (DE 235-6)); claimants' responses to plaintiff's interrogatories ("Garcia-Ancelmo Interrogatory Responses" (DE 233-2); "Covarrubias Interrogatory Responses" (DE 234)); government translations of wiretapped calls between Garcia-Ancelmo and "UM39" or "Guero"

("12/15/2011 Call" (DE 234-2); "Jan.-March 2012 Calls" (DE 234-3)); impeachment evidence concerning Hilaria Rodriguez ("Rodriguez Trial Tr." (DE 234-4); "Rodriguez DEA Interview" (DE 235-1)) and Thurman Bohne ("Bohne Psychological Report" (DE 234-5); "Bohne Plea Agreement" (DE 235-3)); a Wilson County Sheriff's Office report ("Brandon Keel Report" (DE 234-7)); evidence regarding the currency itself ("Currency Photos" (DE 235-4); "Spoliation Email" (DE 235-10)); and excerpts of claimant's tax returns ("Tax Returns" (DE 235-9)).

Plaintiff replied on November 13, 2018, arguing that claimants do not dispute the dispositive facts in this case; and that claimants cannot manufacture a genuine issue of material fact regarding financial impossibility. In support of its reply, plaintiff files a second statement of material facts, along with an appendix of exhibits including Garcia-Ancelmo and Garcia's tax return forms from 2008 to 2011 ("2008 Form 4562" (DE 244-1); "2009 Form 4562" (DE 244-2); "2010 Form 4562" (DE 244-3); "2011 Form 4562" (DE 244-4)). Plaintiff argues proffered testimony by Officer Miller, Sharon Titch, and Special Agent Trillo are admissible. Plaintiff also argues that the opinion testimony of Justo Urena as to claimants' finances should be excluded.

## STATEMENT OF THE UNDISPUTED FACTS

The undisputed facts in this case may be summarized as follows. Claimant Apolinar Garcia-Ancelmo ("Garcia-Ancelmo") was referred by a friend to Special Agent Gilbert Trillo ("Trillo") to help claimant Garcia-Ancelmo transport currency to Mexico. (See Garcia Dep. (DE 220-6) 25:7-15). On February 15, 2012, claimant Garcia-Ancelmo made a phone call to Special Agent Trillo to deliver the currency. (See Trillo Decl. (DE 220-1) ¶ 2). During the call, claimant Garcia-Ancelmo asked Special Agent Trillo to meet him in Wilson, North Carolina. (See id.). When Special Agent Trillo suggested that they meet near I-40 or I-95, claimant Garcia-Ancelmo indicated he did not like to meet near highways. Trillo recalled that "he wanted to meet in an area where it was very rural,

4

where there was nobody there." (Trillo Dep. (DE 220-4) 22:16-18). Claimant Garcia-Ancelmo suggested that Special Agent Trillo meet him on Highway 58 near Highway 264 in Wilson, North Carolina. (See Trillo Decl. (DE 220-1) ¶ 2). Special Agent Trillo asked claimant Garcia-Ancelmo how much Trillo would be picking up, and Garcia stated there would be $308,000.00. (Id.). Later that day, at approximately 8:00 p.m., Trillo received a phone call from Garcia in which Garcia advised him that he would be at the BP Gas Station on Highway 58, as discussed, waiting in a Mazda Tribute. (Id.).

At approximately 8:15 p.m., Special Agent Trillo arrived at the BP Gas Station and observed a Mazda Tribute bearing North Carolina license plate ZTH-2351. (Id. ¶ 3). He later determined that the vehicle was registered to Lucia Covarrubias. (Id.). A man he assumed to be claimant Garcia-Ancelmo (as he had not yet met him) was outside of the vehicle, waiting. (Id.). He has seen a photo taken of claimant Garcia-Ancelmo on his admission to the Wake County Jail on January 14, 2015, and the photo is of the same person he saw on February 15, 2012. (Id.). He parked next to claimant Garcia-Ancelmo, exited his vehicle, and began a conversation. (Id.).

Claimant Garcia-Ancelmo wanted Special Agent Trillo to follow him to a house at an unknown location that he said was a close distance to the gas station, where he could pick up the money. (Id. ¶ 4). Special Agent Trillo refused to travel to any other location with him, telling him that he had "work" in the truck. (Id.). Claimant Garcia-Ancelmo refused to go get the money. (Id.). He called an unidentified person he referred to as his "boss." (Id.). He handed the phone to Special Agent Trillo to negotiate a neutral location with Garcia's boss. (Id.). No agreement as to a meeting location was reached. (Id.). Special Agent Trillo did not recognize the Hispanic male voice on the phone, who spoke to him in Spanish, nor did he identify himself. (Id.). Ultimately, claimant Garcia-Ancelmo refused to go retrieve the money and told Special Agent Trillo that he would call him on

another day to complete the transaction. (Id.). Claimant Garcia-Ancelmo returned to his vehicle and drove away. (Id.).

The next day, on February 16, 2012, at approximately 11:30 a.m., claimant Garcia-Ancelmo called Special Agent Trillo and asked where they could meet to drop off the currency. (Id. ¶ 5). Special Agent Trillo told claimant Garcia-Ancelmo it would have to be later in the day due to other obligations. (Id.). Later that day, at approximately 5:05 p.m., Special Agent Trillo placed a phone call to claimant Garcia-Ancelmo to request a meeting in the parking lot of Wayne County Memorial Hospital located at 2700 Wayne Memorial Drive, Goldsboro, North Carolina. (Id. ¶ 6). Though Garcia expressed concern about there being cameras at the hospital location, he agreed to come. (Id.).

At approximately 5:31 p.m. that same day, claimant Garcia-Ancelmo was traveling to meet Special Agent Trillo at Wayne County Memorial Hospital when the Wayne County Sheriff's Office Interdiction Unit stopped him for an alleged traffic violation. (See id. ¶ 7). Though Special Agent Trillo was not present at the stop, he was aware that it would occur. (Id.). Claimant Garcia-Ancelmo was driving the same Mazda Tribute as the night before. (Id.).

A few minutes after the stop occurred, Special Agent Trillo called claimant Garcia-Ancelmo and asked him where he was. (Id. ¶ 8). Claimant Garcia-Ancelmo told Special Agent Trillo that the police stopped him and that the money was in police hands now. (Id.; Trillo Dep. (DE 220-4) 48:1-22). He was upset and said that they should have met at his place rather than coming out with the money. (Trillo Decl. (DE 220-1) ¶ 8; Trillo Dep. (DE 220-4) 48:1-5). A few minutes later Special Agent Trillo received a phone call from a Hispanic male with a Mexican phone number (52-443-1958562). (Trillo Decl. (DE 220-1) ¶ 8). He identified himself as Garcia's "boss." (Id.). He asked Special Agent Trillo what had happened with the money pick up. (Id.; Trillo Dep. (DE

220-4) 48:15-17). Special Agent Trillo explained that claimant Garcia-Ancelmo was stopped by the police. (Trillo Decl. (DE 220-1) ¶ 8; Trillo Dep. (DE 220-4) 48:18-19).

Claimant Garcia-Ancelmo was stopped by FBI Task Force Officer Matthew Miller ("Miller"), who was at that time a Detective Sergeant with the Wayne County Sheriff's Department. (Miller Decl. (DE 220-2) ¶ 1). On Thursday, February 16, 2012 Officer Miller was instructed as part of the ACE team to provide assistance with an investigation by the Drug Enforcement Administration (DEA). (Id. ¶ 4). The ACE Team is a uniformed street-level narcotics unit aimed at targeted high-crime areas. (Id.). One of its functions is criminal and highway drug interdiction. (Id.). After being briefed on the circumstances of the investigation on February 16, 2012, Officer Miller left the briefing and, as instructed, positioned himself on Wayne Memorial Drive in Goldsboro. (Id. ¶ 5). He waited at a staging location until he was advised that the target (Garcia-Ancelmo) was driving to a designated meet location. (Id.). He was told that the target vehicle would be a small gray Mazda SUV. (Id.). Surveillance units explained via radio communication the direction of travel taken by the target vehicle. (Id.). Officer Miller then intercepted the path of travel of the target vehicle and positioned himself directly behind the vehicle on Wayne Memorial Drive. (Id.). He followed the vehicle for approximately two or three miles before initiating his blue lights and sirens to stop it. (Id.).

Officer Miller was able to record the traffic movements of the target vehicle during this time of observation. As a result of his observations, he stopped the target vehicle for improper left turn and suspicion of driving while impaired (DWI). (Id. ¶6). As a result of his blue lights and siren, the target vehicle stopped on Hare Road just south of its intersection with Wayne Memorial Drive. (Id.).

Once stopped, Deputy Hatch and Officer Miller left their vehicle and walked up to the target vehicle. (Id. ¶ 7). The vehicle was bearing NC license plate ZTH-2351. (Id.). Officer Miller

observed what appeared to be a laundry basket/bucket inside the rear area of the vehicle as he approached to talk with the driver. (Id.). The driver was then identified by his NC issued driver's license as claimant Garcia-Ancelmo. (Id.). As claimant Garcia-Ancelmo was handing his driver's license over to Officer Miller, his hands were noticeably shaking and he appeared unusually nervous for a traffic stop. (Id.). His breathing was labored. (Id.). Officer Miller explained to claimant Garcia-Ancelmo that he was stopped because he had made an improper left turn and due to his suspicion that he was driving while impaired. (Id.). Claimant Garcia-Ancelmo told Officer Miller that he was driving from home to the laundromat to do laundry. (Id.). He said this while motioning with his hand toward the rear of his vehicle. (Id.).

Claimant Garcia-Ancelmo talked with Officer Miller about his nervousness for a brief moment until he returned to his vehicle, where he checked claimant Garcia-Ancelmo's driver information and vehicle registration. (Id. ¶ 8). Officer Miller then returned to claimant Garcia-Ancelmo's vehicle and handed him back all his documents, while continuing to talk with him. (Id.). He asked claimant Garcia-Ancelmo about any previous encounters he may have had with law enforcement. (Id.). He then asked him if he would walk to the back of his vehicle in order to display whether his physical faculties were impaired. (Id.).

After claimant Garcia-Ancelmo walked to the back of the vehicle, Officer Miller made attempts to convey to him that he was free to leave. (Id. ¶ 9). He told him that he did not want to keep claimant Garcia-Ancelmo from doing his laundry. (Id.). As claimant Garcia-Ancelmo was walking back toward the driver's seat of his vehicle, Officer Miller asked him if he had anything illegal in his car. (Id.). Claimant Garcia-Ancelmo immediately said "do you want to check?" (Id.). Officer Miller said, "if you don't care, I'll look." (Id.). Claimant Garcia-Ancelmo opened the rear passenger door. (Id.).

Having obtained claimant Garcia-Ancelmo's consent, Officer Miller then opened the rear hatch and looked inside the laundry basket that was in the back of the car and observed a large, black plastic bag. (Id. ¶ 10). He forced a small opening in the bag and could see what appeared to be a large amount of U.S. currency inside the bag. (Id.). A second, similar bag was located with the one he examined. (Id.). At that point, for safety, Officer Miller placed claimant Garcia-Ancelmo in handcuffs but was careful to explain to him that he was not under arrest. (Id.). Officer Miller opened the front passenger's side door of his vehicle and asked claimant Garcia-Ancelmo to sit inside. (Id.).

Claimant Garcia-Ancelmo then asked Officer Miller to make a deal with him. (Id. ¶ 11). He indicated to Officer Miller that Officer Miller could take the money. (Id.). Officer Miller asked claimant Garcia-Ancelmo if the money was his, and he told Officer Miller that the money was not his. (Id.). Claimant Garcia-Ancelmo told Officer Miller that he was paid $1000 to deliver it. (Id.). Officer Miller then walked back to claimant Garcia-Ancelmo's vehicle and secured the two bags of U.S. Currency inside of it. (Id.). The currency in the two black trash bags was packaged in vacuum-sealed plastic bags. (Id. ¶ 12).

Claimant Garcia-Ancelmo made several more statements to Officer Miller in reference to Officer Miller keeping the money. (Id. ¶ 13). For example, claimant Garcia-Ancelmo said, "the money, it's for you." (Id.). He was very nervous and said "somebody kill me." (Id.). He said, "I give $1,000 for -- for to bring it." (Id.). He said, "I promise them." (Id.). Officer Miller explained to him that he was not going to take the money but that the money would be seized and he would be given a property receipt and then released. (Id.). Deputies Sparks and Hooker made a copy of a handwritten property receipt and then returned to give it to Garcia. (Id.).

After releasing claimant Garcia-Ancelmo, Officer Miller took the seized currency to the

Wayne County Sheriff's Office Annex and handed it over to the DEA. (Id. ¶ 15). Deputy Hatch was present with Miller during the transportation of the money. (Id.).

Additional facts pertinent to the instant motion will be discussed below.

## DISCUSSION

A.     Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to

be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.     Analysis

Federal law provides for forfeiture of certain property, including:

> All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

21 U.S.C. § 881(a)(6). "[T]he burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c). The government may rely on circumstantial evidence to establish forfeitability. United States v. Herder, 594 F.3d 352, 364 (4th Cir. 2010).

When seeking to prove that currency is to be used or intended to be used to facilitate a violation, "there must be a substantial connection between the property and the underlying criminal activity." United States v. Schifferli, 895 F.2d 987, 989 (4th Cir. 1990). "Under the substantial

connection test, the property either must be used or intended to be used to commit a crime, or must facilitate the commission of a crime. At minimum, the property must have more than an incidental or fortuitous connection to criminal activity." United States v. $95,945.18, U.S. Currency, 913 F.2d 1106, 1110 (4th Cir. 1990) (internal citations omitted). "Substantial connection may be established by showing that use of the property made 'the prohibited conduct less difficult or more or less free from obstruction or hindrance.'" Herder, 594 F.3d at 364 (internal citations omitted). In analyzing whether the government has met its burden, the court must analyze the totality of the circumstances. See United States v. Thomas, 913 F.2d 1111, 1115 (4th Cir. 1990).

     1.     Claimants' Objections to Evidence

Claimants raise objections to three different pieces of expert testimony: 1) Officer Miller's opinion that the denominations in this case are consistent with drug trafficking, 2) Sharon Titch's opinion that claimant's tax records from 2008-2011 do not show sufficient profit to account for the money raised, and 3) Special Agent Trillo's testimony that "comida para los caballos" is a code word for drugs. The court addresses each of these objections in turn.

On a motion for summary judgment "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony. Under Rule 702, expert testimony is appropriate when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. A witness qualified as an expert may be permitted to testify where "(b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case." Id.

Federal Rule of Evidence 702 imposes a "basic gatekeeping obligation" upon a trial judge to "ensure that any and all scientific testimony is not only relevant, but reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592–93 (1993). "The proponent of the testimony must establish its admissibility by a preponderance of proof." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001).

"[R]elevance – or what has been called 'fit' – is a precondition for the admissibility of expert testimony, in that the rules of evidence require expert opinions to assist the 'the trier of fact to understand the evidence or to determine a fact in issue.'" United States v. Ancient Coin Collectors Guild, 899 F.3d 295, 318 (4th Cir. 2018) (quoting Daubert, 509 U.S. at 597). The court must determine whether the expert's "reasoning or methodology properly can be applied to the facts in issue." Cooper, 259 F.3d at 199 (quoting Daubert, 509 U.S. at 592–93).

The reliability inquiry is a "flexible one focusing on the principles and methodology employed by the expert, not on the conclusions reached." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (internal quotations omitted). In assessing whether expert testimony is "reliable," the court may consider:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the techniques' operation; and (5) whether the technique has received general acceptance within the relevant scientific or expert community.

United State v. Crisp, 324 F.3d 261, 266 (4th Cir. 2003) (internal quotations omitted). These factors are "neither definitive, nor exhaustive," and "particular factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of [her] testimony." Cooper, 259 F.3d at 199–200. "[T]he court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful[,] ... depend[ing] upon

the unique circumstances of the expert testimony involved." <u>Westberry</u>, 178 F.3d at 261.

Claimants first object to the introduction of Officer Miller's opinion that the money's denominations are consistent with drug trafficking, arguing the opinion should be excluded because of spoliation or under Fed. R. Evid. 702. (Claimant Resp. (DE 231)). "Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." <u>Silvestri v. Gen. Motors Corp.</u>, 271 F.3d 583, 590 (4th Cir. 2001). "A party seeking sanctions based on the spoliation of evidence must establish, inter alia, that the alleged spoliator had a duty to preserve material evidence." <u>Turner v. United States</u>, 736 F.3d 274, 282 (4th Cir. 2013). Claimants have failed to show spoliation is appropriate in this case, because plaintiff did not violate a duty to preserve material evidence. The factual basis for Officer Miller's testimony as to the denominations of currency is premised on what he could see in the packages. (Miller Dep. (DE 235-5) 19:16-22:12). The packages of currency were photographed by Special Agent Trillo and provided to claimants. (<u>See</u> Currency Photos (DE 235-4); Spoliation Email (DE 235-10)). Therefore, the government has not failed to preserve material evidence in this case, because the images of the currency are sufficient to challenge Officer Miller's testimony.

Claimants also raise a <u>Daubert</u> challenge to Officer Miller's testimony that the money was consistent with drug trafficking proceeds because it does not fit the facts, because Officer Miller did not know the denominations of all the bills, and from the photos it appears some stacks have $5-10 bills. Claimants do not challenge Officer Miller's experience or that he viewed the packages of currency. Additionally, Officer Miller's opinion testimony takes in to account that some stacks might have had smaller denominations. (<u>See</u> Miller Dep. (DE 235-5) 21:14-16). The fact that Officer Miller did not know the denominations of all the bills in the stack goes to the weight of his

opinion testimony, rather than admissibility. Officer Miller's inability to see the denominations of every bill of currency is fodder for cross examination. Additionally, the probative value of Officer Miller's testimony is not substantially outweighed by undue prejudice. Accordingly, the court overrules claimants' objection with respect to Officer Miller's testimony.

Turning to Sharon Titch's expert testimony, claimants argue that Titch's testimony in this case does not fit the facts because it relies on the assumption that claimants' alleged savings were derived from the farm labor business from 2009 through November 2011, and therefore must be excluded under Daubert. (Claimants Resp. (DE 231) at 21). However, in Garcia's deposition testimony, she testified at one point in her deposition that claimants started saving the money that was seized "after we bought the store," which Garcia clarified ". . . it was from 2009 and on." (Garcia Dep. (DE 233-4) 15:7-11). Therefore, Titch's opinion has a factual basis on which she would be entitled to rely as an expert, and her testimony is relevant because it addresses the financial conditions of claimants. Claimants may cross examine Titch on whether money saved prior to 2007 could explain where the seized funds came from, (see Titch Dep. (DE 235-8) 54:9-55:7), which would go to the weight of Titch's expert testimony, rather than its admissibility. Therefore, the court finds that Titch's testimony is competent expert testimony, and rejects claimants' Daubert challenge. The court also rejects claimants' objection that the testimony's probative value is substantially outweighed by the prejudice of the testimony, because claimants have presented an alternative factual basis which they ask the court to rely on, and claimants also had the opportunity to come forward with additional financial evidence in discovery. Accordingly, the court rejects claimants' motion to exclude Titch's expert testimony.

Finally, claimants challenge Special Agent Trillo's testimony on the ground that such testimony was not properly disclosed by the government, and thus should be excluded. (Claimants

Resp. (DE 231) at 29-30). The court does not reach claimants' objection because it is not necessary to resolve the instant motion for summary judgment. Special Agent Trillo's testimony as to the meaning of "comida para los caballos" does not impact the disposition of the motion because claimants raise a genuine issue of material fact as to what claimant Garcia-Ancelmo meant when he said "comida para los caballos" on the telephone. (See Garcia-Ancelmo Decl. (DE 233-3) ¶¶ 7-8).

Accordingly, the court leaves for another day the question of whether or not the government failed to disclose Special Agent Trillo's testimony. Claimants are directed to raise such issue again as a motion in limine by the deadline specified by the court if the parties do not otherwise reach a solution to this purported problem. The government will then be given an opportunity to respond to the motion.[2]

2.      Plaintiff's Objection to Evidence

Plaintiff challenges the admission of Urena's expert opinions regarding claimants' ability to save money. Claimants tender Urena as "a qualified expert in the finances and practices of the farm labor industry in claimants' area, is intimately familiar with claimants finances, and opines that claimants could have accumulated the defendant currency fro mtheir legitimate employment . . . ." (Claimant Statement of Facts (DE 232) ¶ 60 (citing Urena Dep. (DE 233-1) 40-42, 116-17)). Plaintiff challenges Urena's testimony about practices concerning how the Mexican people save money, and claimants' spending habits. Plaintiff further argues that Urena has insufficient knowledge to opine that claimants saved money from their farm labor business sufficient to equal the amount in dispute. (Pl. Reply (DE 242) at 9).

In his deposition, Urena opined "if you asking me if he was capable to have that kind of cash,

---

[2]Plaintiff's bald assertion that its disclosures to claimants regarding Special Agent Trillo's testimony were adequate, without providing the court such disclosures, is insufficient to show that such disclosures were in fact adequate. (See Pl. Reply (DE 242) at 4 n.3).

yes.  With the amount of money that he made and knowing how they operate . . . . I talk about in general the Mexican people."  (Urena Dep. (DE 233-1) 116:8-11).  Plaintiff challenges Urena's testimony on the basis that "[c]laimants' expert disclosures noted Mr. Urena's experience with claimants and other farm-business operators in the community as the basis for his opinion . . . ." (Pl. Reply (DE 242) at 9).  Urena's testimony about the saving practices of "the Mexican people" generally is not admissible because Urena's expertise is based on his experience with claimants and other farm-business operators in the community.  Accordingly, while Urena may opine on saving and spending habits based on his relevant experience with the finances and practices of the farm labor industry in claimants' area, he may not generalize his opinions about finances to "the Mexican people."  Accordingly, the court does not rely on generalizations.

However, the remainder of Urena's testimony regarding claimants' personal finances may be considered at summary judgment.  Urena has some experience with claimants' businesses.  (See Urena Dep. (DE 233-1) 21:2-10, 42:9-16, 118:2-20).  Urena's lack of testimony regarding the specific financial details of claimants' businesses goes to the weight, rather than the admissibility, of Urena's testimony.  To the extent plaintiff wishes to question Urena's testimony about the specifics of his knowledge of claimants' businesses and whether they provide sufficient earnings to save $307,970, (see, e.g., Urena Dep. (DE 233-1) 117:7-10), it must do so on cross examination.

Having addressed the evidentiary issues raised by the parties in the instant motion for summary judgment, the court turns to the merits of plaintiff's motion.

3.      Plaintiff's Circumstantial Evidence of the Meeting and Stop

Inconsistent explanations and suspicious travel arrangements provide some evidence of illegal activity.  See United States v. $124,700 in U.S. Currency, 458 F.3d 822, 826 (8th Cir. 2006) ("Gonzolez purportedly carried $125,000 in cash with him on his flight, for the purpose of buying

a truck that he had never seen, from a third party whom he had never met, with the help of a friend whose name he could not recall at trial."); <u>Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars</u>, 403 F.3d at 467; <u>United States v. $22,474.00 in U.S. Currency</u>, 246 F.3d 1212, 1216–17 (9th Cir. 2001) ("Mahone does not deny that he gave conflicting statements regarding the amount of money he was carrying, the origin of the money, and his reasons for visiting Phoenix. He was unable to answer simple questions about his last job, the address of the person he claimed to be visiting, and the name or address of the dealership from which he intended to buy the Tahoe automobile.").

Claimant Garcia-Ancelmo was referred by an unnamed "friend of a friend," who the government contends by uncontroverted testimony was a confidential source, to deliver cash to Special Agent Trillo. (<u>See</u> Garcia-Ancelmo Decl. (DE 233-3) ¶ 3; Trillo Decl. (DE 220-1) ¶ 2); <u>see also</u> <u>$124,700</u>, 458 F.3d at 826. Special Agent Trillo is an officer specializing in drug interdiction, including by posing as a money launderer of drug proceeds. (<u>See</u> Trillo Decl. (DE 220-1) ¶ 1). Claimant Garcia-Ancelmo indicated he did not like to meet near highways, and Special Agent Trillo recalled that "he wanted to meet in an area where it was very rural, where there was nobody there." (Trillo Dep. (DE 220-4) 22:16-18.

Claimants also do not dispute that an unidentified person claimant Garcia-Ancelmo referred to as his "boss" attempted to negotiate a neutral location for Special Agent Trillo to pick up the currency claimants allege belongs to them. (Trillo Decl. (DE 220-1) ¶ 4). Claimant Garcia-Ancelmo was very nervous when he was stopped by Officer Miller, and made a number of statements such as "the money, it's for you," "somebody kill me," "I give $1,000 for – for to bring it," and "I promise them." (Miller Decl. (DE 220-2) ¶ 13). Depending on unidentified third parties to negotiate a meeting place to deliver currency, delivering currency to a drug interdiction officer

that claimants had never met before, as well as avoiding populated areas, are all patterns of travel that raise a reasonable inference of illegal activity. However, plaintiff's burden is to show a substantial connection to illegal <u>drug</u> activity. <u>See</u> 21 U.S.C. § 881(a)(6). This evidence, standing alone, is insufficient to show that no reasonable trier of fact would find the money not substantially connected to illegal drug activity.

In addition, claimants have offered an alternative explanation for why claimant Garcia-Ancelmo acted in the manner in which he did. Specifically, claimants were allegedly seeking to transport the money to purchase a mango farm. (<u>See, e.g.</u>, Garcia-Ancelmo Decl. (DE 233-3) ¶ 3; Garcia Dep. (DE 233-4) 38:18-39:1). Claimants also argue that claimant Garcia-Ancelmo was nervous when stopped by Officer Miller because he was in the country illegally. (<u>See</u> Garcia-Ancelmo Decl. (DE 233-3) ¶ 5). These statements raise a genuine issue of material fact regarding circumstances surrounding the stop.

4.      The Amount and Packaging of the Currency

The government also argues the amount of money and packaging of the drugs shows the currency shows as a matter of law that the currency in this case facilitates drug trafficking.

"[T]he possession of unusually large amounts of cash . . . may be circumstantial evidence of drug trafficking." <u>Thomas</u>, 913 F.2d at 1115; <u>see also</u> <u>United States v. $242,484.00</u>, 389 F.3d 1149, 1161 (11th Cir. 2004) (en banc) ("A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack. They don't, because there are better, safer means of transporting cash if one is not trying to hide it from the authorities."); <u>United States v. $252,300.00 in U.S. Currency</u>, 484 F.3d 1271, 1274–75 (10th Cir. 2007); <u>$22,474.00</u>, 246 F.3d at 1216; <u>United States v. $67,220.00 in U.S. Currency</u>, 957 F.2d 280, 285 (6th Cir. 1992). This circumstantial evidence is particularly

strong when "the seized money was packaged, in bundles within vacuum-sealed, plastic bags, a technique 'known to be used by drug dealers to prevent discovery by drug-sniffing dogs.'" <u>United States v. Edwards</u>, 834 F.3d 180, 199 (2d Cir. 2016) (quoting <u>$242,484.00</u>, 389 F.3d at 1162); <u>United States v. $200,000 In U.S. Currency</u>, 210 F. Supp. 3d 788, 795–96 (M.D.N.C. 2016), <u>aff'd sub nom.</u> <u>United States v. Phillips</u>, 883 F.3d 399 (4th Cir. 2018); <u>see also</u> <u>United States v. $252,300.00 in U.S. Currency</u>, 484 F.3d 1271, 1274–75 (10th Cir. 2007) (holding cellophane wrapping evidence of drug trafficking because wrapping is used to avoid detection by drug dogs).

Here, it is undisputed that claimant Garcia-Ancelmo was carrying almost $308,000 in currency. (<u>See</u> Trillo Decl (DE 220-1) ¶ 2). The currency was packaged in bundles within vacuum-sealed plastic packages inside two black trash bags. (<u>See</u> Miller Decl. (DE 220-2) ¶ 12). Special Agent Trillo and Officer Miller, both of whom have expertise in drug interdiction and drug enforcement cases, recognize use of such materials is a technique drug dealers use to conceal currency from detection by drug sniffing dogs. (<u>See</u> Trillo Decl. (DE 220-1) ¶¶ 1, 12; Miller Decl. (DE 220-2) ¶¶ 1-3, 16).[3] Additionally, some courts have recognized such packaging as evidence of proceeds being used for drug trafficking. <u>See, e.g.</u>, <u>Edwards</u>, 834 F.3d at 199; <u>$242,484.00</u>, 389 F.3d at 1162; <u>$200,000 In U.S. Currency</u>, 210 F. Supp. 3d at 795–96. This evidence supports a reasonable inference that the money was being transported for illegal purposes.

However, claimants raise a genuine issue of material fact as to why they were carrying such a large amount of currency packaged in the manner that it was packaged. Claimants state that they packaged the currency in plastic because they buried it in their backyard and needed to protect it from the weather. (<u>See</u> Garcia Dep. (DE 233-4) 23:9-14; Garcia-Ancelmo Interrogatory Responses

---

[3]The court does not rely on Special Agent Trillo or Officer Miller's opinions with respect to how a legitimate business would transport its money. Nonetheless, their testimony is competent to show that transporting a large amount of cash in such packaging is indicative of drug trafficking.

(DE 233-2) at 15). Additionally, the claimants explained that they did not do business with a bank because "there was a fraud in the bank" that caused them not to trust dealing with a financial institution. (See Garcia Dep. (DE 233-4) 24:2-17). This testimony raises a reasonable inference that claimants would carry cash and package it in plastic for purposes other than illegal drug activity. Thus, the court must reject the government's inference at summary judgment.

　　5.　　Inability to Explain the Amount of Currency

In evaluating circumstantial evidence of drug trafficking, the court must consider other factors as well. An inability to sufficiently explain the source of currency is evidence of illegal activity. See $252,300.00, 484 F.3d at 1275 ("Nowden contended that he borrowed the bulk of the currency, $200,000, from Carter, yet he could produce no documents to substantiate the transaction."); United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars, 403 F.3d 448, 467 (7th Cir. 2005); United States v. $174,206.00 in U.S. Currency, 320 F.3d 658, 662 (6th Cir.2003) (giving controlling weight to evidence that "the Claimants' legitimate income was insufficient to explain the large amount of currency found in their possession"); $22,474.00, 246 F.3d at 1217; United States v. $433,980 in U.S. Currency, 473 F. Supp. 2d 685, 691–92 (E.D.N.C. 2007) ("Rodriguez says that he acquired the $433,980 lawfully, through several years of personal savings while employed as a limousine driver. Yet . . . Rodriguez has refused to answer any questions or produce evidence that he in fact obtained the $433,980 in that way.").

Claimants' theory that the money in this case constitutes their savings from a profitable farm labor business may be evaluated from their tax returns. In 2008, claimants reported $34,406.00 in net income from their business, in 2009 claimants reported $33,032.00 in net income from their business, in 2010 claimants reported $40,287.00 in net income from their business, and in 2011 claimants reported $42,574.00 in net income from their business. (See "Tax Returns" (DE 235-9)).

In her deposition, Sharon Titch also noted that Lucia Covarrubias reported $20,188.00 of income in 2011 (See Titch Dep. (DE 235-8) 48:4-21). Claimants Garcia-Ancelmo and Garcia also claimed $107,382.00 in total depreciation expenses from 2008 – 2011, of which $87,718.00 represented the cost of business assets purchased in cash. (See "2008 Form 4562" (DE 244-1); "2009 Form 4562" (DE 244-2); "2010 Form 4562" (DE 244-3); "2011 Form 4562" (DE 244-4); Garcia Dep. (DE 233-4) 16:1-18; 54:2-3 ("[W]e purchased everything in cash.")). In total, these sums amount to $190,151.00.

During this time, claimants paid all their living expenses out of the money that was profit from the farms. (Garcia Dep. (DE 220-6) 16:22-17:8). Claimants reside together and had living expenses which amounted to approximately $2,260.00 per month, or $27,120.00 per year. (Supplemental Interrogatory Responses (DE 220-13) at 2). Cirila Garcia also sent $300.00 to her mother in Mexico every two weeks, which would amount to $7,800.00 per year. (Garcia Dep. (DE 220-6) 26:13-20). Claimants Garcia-Ancelmo and Garcia also used farm profits to buy a Big Daddy's convenience store in 2010 for $150,000.00 to be paid over three years in equal installments. (See Garcia Dep. (DE 220-6) 36:11-37:15; Garcia Decl. (DE 235-6) ¶ 5). Since the currency was seized on February 16, 2012, claimants Garcia-Ancelmo and Garcia would have spend $100,000.00 on Big Daddy's. In total, claimants' expenses from 2008-2011 amount to approximately $239,680.00.

Based on the record before the court, claimants' income less expenses from 2008 – 2011 fails to come anywhere remotely close to savings of $307,970.00. This raises a reasonable inference that the currency in dispute are proceeds of illegal drug activity. However, a reasonable trier of fact might also reasonably conclude the proceeds are from some other illegal activity during that time, or from some legitimate source outside the period from 2008-2011. As discussed above, plaintiff's

burden is not to show that the money is connected to any illegal activity, but the money is connected to illegal drug activity.  <u>See</u> 21 U.S.C. § 881(a)(6).  Moreover, claimants argue that deposition testimony shows that the $307,970.00 in this case represents savings from their farm labor business dating back to the beginning of their business.  (<u>See</u> Garcia Dep. (DE 233-4) 37:24-38:17; Urena Dep. (DE 233-1) 43:4-11).  Therefore, the court must reject the inference plaintiff raises as insufficient to support its motion for summary judgment.

　　　　6.　　　　Government's Evidence of Illegal Drug Activity

On summary judgment, the government presents several pieces of evidence to show that claimant Garcia-Ancelmo is involved in drug trafficking.  This evidence includes expert testimony from Special Agent Trillo that claimant Garcia-Ancelmo spoke using the word "work" as code language for drugs or drug proceeds, and expert testimony from both Special Agent Trillo and Officer Miller that the circumstances of the stop were consistent with drug trafficking.  (<u>See</u> Trillo Decl. (DE 220-1) ¶¶ 1, 12; Miller Decl. (DE 220-2) ¶¶ 1-3, 16).  Additionally, the government offers testimony from Thurman Bohne and Hilaria Rodriguez, two individuals convicted of drug trafficking, that claimant Garcia-Ancelmo supplied them with drugs.  (<u>See</u> Bohne Dep. (DE 220-8); Rodriguez Dep. (DE 220-9)).

However, claimants deny their involvement with selling drugs.  (<u>See</u> Garcia-Ancelmo Decl. (DE 233-3) ¶¶ 2, 5-8; Garcia Decl. (DE 235) ¶ 2; Covarrubias Dep. (DE 233-5) 86:16-18).  Consequently, claimants raise a genuine issue of material fact as to whether they have engaged in drug trafficking.

The court concludes by reiterating that the government must show, by a preponderance of the evidence, that the currency in this case is "substantially connected" to a controlled substance violation.  <u>See</u> 18 U.S.C. § 983(c); 21 U.S.C. § 881(a)(6); <u>Schifferli</u>, 895 F.2d at 989.  To be entitled

to summary judgment, no reasonable trier of fact must be able to find that the currency in this case is not connected to illegal drug activity. The parties clearly dispute claimants' involvement in drug activity, and the arguments raised by the government are insufficient for the reasons set for above to warrant summary judgment. Accordingly, the court denies plaintiff's motion for summary judgment.

## CONCLUSION

Based on the foregoing, plaintiff's motion for summary judgment (DE 217) is DENIED. Where claims remain for trial, and where the court's prior case management order dated November 29, 2012, as amended October 15, 2013 and April 10, 2017, established deadlines no longer feasible for trial, this case now is ripe for entry of a new case management order governing deadlines and procedures for final pretrial conference and trial. The parties are DIRECTED to confer and file within 14 days from the date of this order a joint status report informing of 1) estimated trial length; 2) particular pretrial issues which may require court intervention in advance of trial, if any; and 3) at least three suggested alternative trial dates.

SO ORDERED, this the 1st day of March, 2019.

LOUISE W. FLANAGAN
United States District Judge