IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:12-CV-136-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER |
| $307,970.00 IN U.S. CURRENCY, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| APOLINAR GARCIA-ANCELMO, | ) | |
| CIRILA PINEDA GARCIA, and LUCIA | ) | |
| COVARRUBIAS, | ) | |
| | ) | |
| Claimants. | ) | |

This matter comes before the court on claimants' motion to exclude expert testimony of Kenneth Prevost ("Prevost") and evidence of his police dog Iko, pursuant to Federal Rules of Evidence 403, 702, and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) (DE 215) ("Daubert motion"). Claimants also move to exclude expert testimony by Kenneth Furton ("Furton"), a chemist and forensic scientist, also pursuant to Rules 403, 702, and Daubert (DE 216). Finally, plaintiff moves to exclude testimony by Leonardo Lecci ("Lecci"), a psychologist, pursuant to Rules 403, 702, and Daubert (DE 240). The issues raised by the motions have been fully briefed by the parties, and in this posture are ripe for ruling. For the reasons that follow, claimants' motions are denied, and plaintiff's motion is granted.

## BACKGROUND

Plaintiff initiated this civil forfeiture action on July 12, 2012, by filing a complaint for forfeiture in rem against $307,970.00 in U.S. currency ("currency") pursuant to 21 U.S.C. § 881(a)(6), asserting that the currency was used or intended to be used in exchange for controlled substances, represented proceeds of trafficking in controlled substances, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. §§ 801 et seq. Claimants deny the alleged connection between the seized currency and drug trafficking, and seek return of the currency. A lengthy period of discovery, interspersed with various stays of the case, followed. Plaintiff moved for summary judgment, arguing it was entitled to judgment as a matter of law that the currency was substantially connected to controlled substances within the meaning of 21 U.S.C. § 881(a)(6). The court denied plaintiff's motion for summary judgment and set this matter for trial commencing October 21, 2019.

This case has a complex procedural history and lengthy factual background. The court recounts the following facts and procedure pertinent to the issues now under consideration. Claimant Apolinar Garcia-Ancelmo ("A. Garcia") met with an undercover drug interdiction officer, Special Agent Gilbert Trillo ("Trillo"), in order arrange transport of the currency to Mexico. On the way to meet Trillo, claimant A. Garcia was stopped by FBI Task Force Officer Matthew Miller ("Miller"), then investigating claimant A. Garcia. Miller allegedly observed claimant A. Garcia commit traffic violations, and initiated a traffic stop. During the traffic stop, Miller asked for and received consent to search claimant A. Garcia's car.[1] Upon searching the car, Miller discovered the currency buried under a pile of laundry in a bin, concealed within two black trash bags and packaged

---

[1] The court notes that, at summary judgment, the parties did not dispute that the car in fact was registered to claimant Covarrubias. However, since claimant A. Garcia was the one stopped by Miller, the court refers to the car as claimant A. Garcia's vehicle.

in vacuum-sealed plastic bags. The parties dispute whether claimants collectively had enough legitimate income to account for the currency.

Plaintiff seeks to qualify two experts to help prove that the currency discovered in the vehicle bears a substantial connection to controlled substances. First, plaintiff seeks to qualify Prevost as an expert on the meaning of certain behaviors of his police dog, Iko. Following Miller's discovery of the currency in claimant A. Garcia's car, Prevost and Iko arrived at the scene to conduct a sniff for drugs. Although Prevost is able to testify as a lay witness to certain events in this case, claimants specifically seek to exclude Prevost's opinion testimony that, based on his training and experience as Iko's handler, Iko alerted to the presence of drugs on the exterior of the car and on the currency in the trunk of the car. Claimants rely upon certification records, training records, usage reports on field performance, dash camera video footage from the traffic stop of claimant A. Garcia's car, video footage of Prevost in a Highland Canine training video, testimony from Prevost, Furton, Andy Falco-Jimenez ("Falco"), claimants' expert on drug detection dog training, handling, and behavior, and other officers. In opposition, plaintiff relies upon and supplements the same.

Plaintiff also seeks to qualify Furton as an expert in the area of chemistry and forensic science. More specifically, plaintiff proffers Furton to opine that "innocent contamination" of the currency could not explain detection of drugs by Iko. In other words, Furton opines that, if a drug detection dog smells drugs on currency, the amount of drugs is not a residual amount found in the general population of currency, but instead residue resulting from recent illegal activity. Claimants seek to exclude this testimony, relying upon testimony by Furton; Jay M. Poupko ("Poupko"), claimants' expert in chemistry and forensic toxicology; Stefan Rose ("Rose"), one of Furton's colleagues that collaborated on Furton's experiments; Sanford Angelos ("Angelos"), a chemist who testified in United States v. Funds in Amount of One Hundred Thousand One Hundred & Twenty

Dollars ($100,120.00) that the results of Furton's studies are incorrect; and several pieces of scientific literature. Plaintiff relies upon the same, and supplements claimants' evidence with an additional peer reviewed and published study by Furton.

In addition to expert testimony, plaintiff also seeks to establish a substantial connection between the currency and the drugs through lay witnesses that testify claimant A. Garcia dealt them cocaine. Claimants seek to admit expert testimony of Lecci to opine that one of plaintiff's witnesses, Thurman Bohne ("Bohne"), is unable to recall the events to which he will testify, and that he is likely to make false statements. Plaintiff moves to exclude Lecci's testimony, relying upon testimony by Bohne, Lecci, and Heather Ross ("Ross"), a psychologist who had previously examined Bohne. Opposing the motion, claimants also rely upon Lecci's testimony, further relying upon reports of investigation, plaintiff's expert disclosures, and Lecci's curriculum vitae ("CV").

## DISCUSSION

A.     Standard of Review

The standard of review is common to all three motions now before the court. Federal Rule of Evidence 702 governs the admissibility of expert opinion testimony. Under Rule 702, expert testimony is appropriate when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. A witness qualified as an expert may be permitted to testify where "(b) the testimony is based upon sufficient facts or data, (c) the testimony is the product of reliable principles and methods, and (d) the expert has reliably applied the principles and methods to the facts of the case." Id.

Federal Rule of Evidence 702 imposes a "basic gatekeeping obligation" upon a trial judge to "ensure that any and all scientific testimony is not only relevant, but reliable." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579,

592–93 (1993). "The proponent of the testimony must establish its admissibility by a preponderance of proof." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001).

"[R]elevance – or what has been called 'fit' – is a precondition for the admissibility of expert testimony, in that the rules of evidence require expert opinions to assist the 'the trier of fact to understand the evidence or to determine a fact in issue.'" United States v. Ancient Coin Collectors Guild, 899 F.3d 295, 318 (4th Cir. 2018) (quoting Daubert, 509 U.S. at 597). The court must determine whether the expert's "reasoning or methodology properly can be applied to the facts in issue." Cooper, 259 F.3d at 199 (quoting Daubert, 509 U.S. at 592–93).

The reliability inquiry is a "flexible one focusing on the principles and methodology employed by the expert, not on the conclusions reached." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (internal quotations omitted). One factor pertinent to reliability is the proposed expert's qualifications. See Giddings v. Bristol–Myers Squibb Co., 192 F.Supp.2d 421, 425 (D. Md. 2002). A witness may qualify to render expert opinions in any one of the five ways listed in Rule 702: knowledge, skill, experience, training, or education. Kumho Tire, 526 U.S. at 147. The United States Court of Appeals for the Fourth Circuit has ruled that when an expert's qualifications are challenged, "'the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered.'" Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir.1993) (quoting Thomas J. Kline, Inc. v. Lorillard, Inc., 878 F.2d 791, 799 (4th Cir.1989)).

In assessing whether expert testimony is "reliable," the court considers additional factors besides the expert's qualifications. These include:

> (1) whether a theory or technique can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and

> maintenance of standards controlling the techniques' operation; and
> (5) whether the technique has received general acceptance within the
> relevant scientific or expert community.

United States v. Crisp, 324 F.3d 261, 266 (4th Cir. 2003) (internal quotations omitted). These factors are "neither definitive, nor exhaustive," and "particular factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Cooper, 259 F.3d at 199–200. "[T]he court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful[,] ... depend[ing] upon the unique circumstances of the expert testimony involved." Westberry, 178 F.3d at 261.

Of course, the admission of expert testimony must be considered within the context of the other rules of evidence. In particular, Rule 403 provides that the court must ensure that the probative value of any proffered evidence is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. As this court has noted, "[d]espite the court's ability to exercise broad discretion and flexibility when determining the admissibility of expert testimony, the court must balance this discretion with the concerns of Rule 403 to ensure that the probative value of the proffered testimony is not 'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" Bouygues Telecom, S.A. v. Tekelec, 472 F. Supp. 2d 722, 725 (E.D.N.C. 2007) (quoting Fed. R. Evid. 403).

B.     Claimants' Motion to Exclude Prevost and Evidence of Dog (DE 215)

Claimants move to exclude Prevost's testimony concerning Iko's behavior on the ground that it is not reliable.[2] "Experiential expert testimony . . . does not 'rely on anything like a scientific

---

[2] Prevost's testimony is relevant. The court's analysis focuses on whether Prevost's expert opinions are reliable.

method.'" United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007). "Where an expert's methodology is grounded in his experience . . . a proper methodology analysis focuses on three areas: 1) how the expert's experience leads to the conclusion reached; 2) why that experience is a sufficient basis for the opinion; and 3) how that experience is reliably applied to the facts of the case." SAS Inst., Inc. v. World Programming Ltd., 125 F. Supp. 3d 579, 589 (E.D.N.C. 2015), aff'd, 874 F.3d 370 (4th Cir. 2017). In addition, a proper motion to exclude may demonstrate that an expert's experience is atypical of other experts in the relevant industry, thus undermining the requirement that an expert's proposed testimony be based on facts or data upon which experts in the particular field would reasonably rely. See Fed. R. Evid. 703.

Several factors bear specifically on the reliability of a drug detection dog, including training, certification, test results, field performance, and circumstances surrounding a particular alert, such as cuing or working in unfamiliar conditions.[3] See Fla. v. Harris, 568 U.S. 237, 245–48 (2013); United States v. Green, 740 F.3d 275, 283 (4th Cir. 2014); United States v. Gadson, 763 F.3d 1189, 1202 (9th Cir. 2014). "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert . . . . The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." Harris, 568 U.S. at 246–47; see United States v. Boxley, 373 F.3d 759, 762 (6th Cir. 2004); United States v. Sanchez-Pena, 336 F.3d 431, 444 (5th Cir. 2003). Although field performance is relevant, records from controlled testing are to be given greater weight than field performance records. See Harris, 568 U.S. at 245–46.

---

[3] Claimants object to the use of reliability criteria developed in the context of probable cause hearings for illegal searches and seizures. (See Cl. Reply (DE 251) at 2-5). However, claimants cite no authority that shows the indicators of reliability for a drug detection dog are different merely because the court must view the evidence in light of a different standard of review.

The certifications in the record support Iko's reliability. Together with a prior handler, Iko satisfactorily completed performance trials and was certified in narcotics detection on November 20, 2010, by the United States Police Canine Association ("USPCA"). (First Narcotics Detection Certification (DE 238-3); see Performance Evaluations (DE 238-4)). USPCA is an independent organization that conducts performance trials and issues certifications for law enforcement canine units. (Prevost Dep. (DE 238-1) 64:20-65:12). About two months after the search of claimant A. Garcia's car, Iko again received certification in narcotics detection from the USPCA, this time with Prevost as his handler.[4] (Second Narcotics Detection Certification (DE 215-2)). Iko's ability to alert to the satisfaction of drug detection dog certification professionals in a controlled testing environment shows that he is reliable.

Iko and Prevost's training also demonstrates Iko's reliability. Beginning in September 2011, Iko was paired with Prevost, and together the team underwent a fourteen-week basic handler course operated by East Coast Canine training school, which included training in narcotics detection. (Prevost Dep. (DE 236-1) 18:23-19:6). Iko had already been trained to identify the odor of narcotics with his previous handlers, but training school taught Prevost how to handle Iko and how to read Iko's changes in behavior. (Prevost Dep. (DE 236-1) 19:22-20:3). Even after completing the handler course with Iko, the team continued to engage in training to maintain Iko's proficiency in detecting drugs. Prior to searching claimant A. Garcia's car, Prevost logged over 30 additional hours of narcotics detection training with Iko. (See Dec. 2011 Training Logs (DE 215-5); Jan. 2012 Training Logs (DE 215-6); and Feb. 2012 Training Logs (DE 215-7; Prevost Dep. (DE 215-14)

---

[4] Claimants make much of the fact that Prevost and Iko had not been certified as a team at the time that they searched claimant A. Garcia's car. However, Iko had already been certified with a previous handler, and formal certification of a team is not a prerequisite to establishing the dog's reliability. See Harris, 568 U.S. at 246–47. Additionally, formal certification followed within a reasonable time after the search, which still provides some indication of reliability.

24:17-25:7). During those training sessions, Iko was tested in seven controlled hides of narcotics, and Iko was able to locate the drugs every time. (See Dec. 2011 Training Logs (DE 215-5); Jan. 2012 Training Logs (DE 215-6); and Feb. 2012 Training Logs (DE 215-7)).

While not as important as certification and training, Iko and Prevost's field performance also show Iko's reliability. From December 4, 2011, to February 12, 2012, Prevost handled Iko for approximately 20 sniffs. (Dec. 2011 Usage Report (DE 215-8) at 2-3; Jan. 2012 Usage Report (DE 215-9) at 1-2, 4; Feb. 2012 Use Report (DE 215-9) at 1-4). Of the 16 sniffs that resulted in alerts, 14 either resulted in finding drugs or other direct evidence corroborated the recent presence of drugs at the scene. (See Dec. 2011 Usage Report (DE 215-8) at 2-3; Jan. 2012 Usage Report (DE 215-9) at 1-2, 4; Feb. 2012 Use Report (DE 215-9) 1-4). Therefore, approximately 14 of 16 of Iko's positive alerts to the odor of narcotics in the field have been shown not to be false positives. See Green, 740 F.3d at 283 (holding an adjusted success rate of 43%, less than half Iko's success rate, sufficiently reliable to find probable cause). Together with Iko's training and certifications, plaintiff has demonstrated Iko was reliable. For the same reasons, Prevost's training and experience with Iko provides sufficient basis for his opinions on the meaning of Iko's behavior.

Prevost's training and experience also illustrates how Prevost's experience leads him to the conclusion reached. Prevost would command Iko to search using a phrase such as "find drugs." (Prevost Dep. (DE 215-14, 238-1) 17:7-13, 21:22-22:6; Jan. 2012 Training Logs (DE 215-6) at 1). Prevost observed that, upon detecting drugs, Iko would alert through certain changes in behavior. (Prevost Dep. (DE 215-14) 13:10-12). One behavior, initially taught by Iko's previous handlers, was to sit. (Prevost Dep. (DE 238-1) 22:16-20; Dec. 2011 Training Logs (DE 215-5) at 2). However, Prevost also observed Iko alert to the odor of narcotics through other behaviors, such as freezing up, staring, and snapping his head. (Prevost Dep. (DE 215-14, 238-1) 14:4-15:14, 44:22-

46:13; Dec. 2011 Training Logs (DE 215-5) at 2; Jan. 2012 Training Logs (DE 215-6) at 1). Iko's alert behavior did not change during the course of his time with Prevost. (Prevost Dep. (DE 215-14) 17:14-17).

Finally, Prevost's testimony, together with the dash camera video recording of the drug detection dog search, establishes as a threshold matter that he reliably applied his training and experience to the facts of this case by personally observing Iko's behavior. Prevost and Iko arrived on the scene. (See Dash Camera Video (DE 215-11) 26:07).[5] Prevost directed Iko around the exterior of the vehicle to sniff for the scent of narcotics, walking him backwards so Prevost could watch him and look for a change in his behavior. (Dash Camera Video (DE 215-11) 26:21-26:57; see Prevost Dep. (DE 215-14) 30:1-6, 82:2-5). Prevost testifies that, at the end of the sniff of the exterior of the vehicle, Iko alerted to the exterior of the vehicle because he stopped, his legs were no longer moving, and he squatted. (Prevost Dep. (DE 215-14) 78:2-19; Dash Camera Video (DE 215-11) 26:52-26:01). After sniffing the exterior of the car, Iko then jumped into the rear hatch portion of the vehicle and began sniffing for odors. (Prevost Dep. (DE 215-14) 82:20-83:9; Dash Camera Video (DE 215-11) 27:25-27:30). Prevost testifies that he pointed to the interior of the car to direct Iko to continue to sniff other parts of the vehicle, but that Iko would not move because he had already detected the odor of drugs. (Prevost Dep. (DE 215-14) 83:13-84:19; Dash Camera Video (DE 215-11) 27:30-27:46). In response to Prevost's instruction to continue to search the car, he sniffed around the rear hatch area, and proceeded to sit and stare. (Prevost Dep. (DE 215-14) 83:13-84:19; Dash Camera Video (DE 215-11) 27:30-27:46). Consistent with his training and experience, Prevost opines that Iko was alerting to the rear hatch portion of the vehicle, including

---

[5] All citations herein to this dash camera video and the Highland Canine training video (DE 215-12) are to the time stamp in minutes and seconds (for example, "00:00") appearing in the player on which the court viewed the videos, VLC Media Player.

the laundry basket. (Prevost Dep. (DE 215-14) 85:8-21; see, e.g., Dec. 2011 Usage Report (DE 215-8) at 2-3; Jan. 2012 Usage Report (DE 215-9) at 1-2, 4; Feb. 2012 Use Report (DE 215-9) at 1-4).

Claimants raise numerous arguments in an effort to put down Prevost and Iko's reliability. First, claimants contend Prevost "admits" his method of handling Iko was "unreliable," relying on a testimonial video from Highland Canine training school. (Cl. Mem. (DE 215) at 7). Prevost stated on camera that "the detection works way better" using the method learned at Highland Canine, as opposed to the method he used with Iko at the time he searched claimant A. Garcia's car. (Highland Canine Video (DE 215-12) 1:52-1:59). Prevost also commented that the method he previously used before training with Highland Canine presented a risk of "falsing." (Highland Canine Video (DE 215-12) 2:30-2:53). Claimants' argument fails in light of Iko's demonstrated record of success in properly detecting and alerting to drugs through his certifications, training, and performance in the field. All claimants have proven in submitting this video is that the Highland Canine training is very effective; based on all the evidence discussed above, it does not follow that Prevost's method was unreliable.

Claimants contend Prevost and Iko's training was inadequate in two other ways as well: lack of extinction training and lack of proofing off currency. (Cl. Mem. (DE 215) at 19-20). Extinction training is training a dog not to alert to small quantities of drugs. (See Falco Dep. (DE 215-20) 84:18-87:5). Claimants' expert Falco testifies that, at a certain point, the "amount of narcotics is so minute and so residual that we should be ignoring it." (Falco Dep. (DE 215-20) 86:19-21). Claimants' extinction argument runs into two separate problems. First, detection of a residual odor of controlled substances is probative of a connection to those substances, no matter how strong or weak that odor is. See Harris, 568 U.S. at 245, 249; Green, 740 F.3d at 283 n.3. Second, plaintiff also intends to call Furton to testify that Iko would not be able to detect trace amounts of cocaine

on "innocently contaminated" currency not exposed to drugs within a relatively recent time period. (See Furton Report (DE 216-6) at 10-12). For these reasons, a lack of extinction training does not undermine the reliability of Prevost's testimony.

Claimants further attack Prevost and Iko's training, arguing that Iko was not proofed off other items commonly found with drugs, such as plastic or currency. (Cl. Mem. (DE 215) at 19-20). Falco testifies that proofing, or rewarding a dog only for detecting the smell of narcotics, is important because if a trainer rewards a dog for detecting an odor other than narcotics, the dog may alert to that odor in the future, rather than the smell of narcotics. (Falco Dep. (DE 215-20) 61:2-62:21). The record is devoid of evidence that Iko had ever trained with currency or plastic, or that he had ever previously been rewarded for alerting to the odor of such items. (See Prevost Dep. (DE 215-14) 41:13-20). Iko's certification, training, and performance logs ultimately are sufficient indicia of reliability in detecting illegal narcotics. The jury may consider whether, given the circumstances, failure to proof Iko makes it likely that he alerted to something other than drugs.

Turning to Iko's performance in the field, claimants also argue he was prone to false alerting. (See Cl. Mem. (DE 215) at 16). Claimants do not give Iko a fair shake. Their contention that Iko falsely alerted one out of four times in the field significantly overstates the risk of a false positive as discussed by the court above, and also ignores Iko's training and certification in narcotics detection. Therefore, claimants' argument that Iko frequently falsely alerted is without merit.

Next, claimants contend that Prevost "cued" Iko to alert. (Cl. Mem. (DE 215) at 9). Claimants heavily rely on Falco, as well as a scientific study on handler bias, to argue that Iko was influenced by Prevost to alert to the currency. (See Falco Report (DE 215-13) at 4-5; Lit Study (DE 215-16) at 5-7). Falco points to two different instances where he testifies that Iko was cued to alert for drugs: 1) Miller's alleged statement that "I want him to see what's in the laundry basket right

12

away," and 2) Prevost allegedly pointing at the laundry basket.  Turning to Falco's first point, Miller is not directing Prevost to search any particular area, but recounting the traffic stop to another officer.  Specifically, he says:

> It was good, because I said "alright man well you have a good day, go do your laundry, but you ain't got nothing in there right?"  He said "nah, you want to look?"  I said "yeah, if you'll let me."  He opened up the door.  I wanted to see what was in that laundry basket right away . . . .

(Dash Camera Video (DE 215-11) 26:32-26:52).  Throughout the conversation, Miller never turns his attention to Prevost at all.  (See Dash Camera Video (DE 215-11) 26:32-26:52).  For his part, Prevost is not paying any attention to Miller, but is focused on leading Iko around the vehicle.  (Dash Camera Video (DE 215-11) 26:32-26:52).  Indeed, claimants present no evidence showing that Prevost even heard Miller or knew the context of the conversation between the other officers, having only just arrived one minute beforehand.  (See Dash Camera Video (DE 215-1) 26:07).  Therefore, the court is satisfied for purposes of Daubert that Miller did not cue Prevost.

Similarly, claimants assert that Prevost directed Iko to alert by pointing to the laundry basket.  (Falco Report (DE 215-13) at 5, 8).  This is factually inconsistent with Prevost's testimony, where he testifies that he was pointing over the laundry basket to direct Iko to search the rest of the car.  (Prevost Dep. (DE 238-1) 83:13-84:19).  The court credits Prevost's explanation and leaves it to the fact finder to weigh to such explanation.  (See Dash Camera Video (DE 215-11) 27:30-27:46).  Claimants also rely on the Lit Study support their argument that handler beliefs can result in false alerts.  (Lit Study (DE 215-16) at 5-7).  For the reasons discussed above, the court is not satisfied that the Lit Study has any application to the instant case.

Claimants argue Prevost's inconsistent explanations as to Iko's alerting behavior and where Iko alerted to in the car make his expert opinion unreliable.  (Cl. Mem. (DE 215) at 10-16).  The

court's review of Prevost's testimony reveals no significant inconsistencies between his description of Iko's behavior on the day claimant A. Garcia's car was searched and previous statements describing Iko's alerts. Moreover, inconsistent explanations certainly provide ideal fodder for cross-examination. Prevost's alleged inconsistencies go to the weight the fact finder should assign to his testimony, not his reliability.

Finally, claimants contend that no dog trainer, handler, or animal behavior expert vouches for the reliability of Iko and Prevost on February 12, 2012. (Cl. Mem. (DE 215) at 20-23). Prevost and Iko's certifications, training, and field performance, standing alone, are sufficient to confer the imprimatur of expertise.

Turning to what remains, Prevost's testimony and evidence of Iko's sniff is highly probative of a connection between the currency and illegal narcotics, an important fact for resolving the ultimate issue in this case. See 21 U.S.C. § 881(a)(6); United States v. Schifferli, 895 F.2d 987, 989 (4th Cir. 1990). Any prejudice accruing to claimants is neither unfair nor substantially outweighs the probative value of the evidence. Claimants have video footage of traffic stop, the ability to cross-examine Prevost, and opportunity to call their own expert to interpret the evidence of the sniff. See United States v. Siegel, 536 F.3d 306, 319 (4th Cir. 2008) ("Evidence may be excluded under Rule 403 only if the evidence is unfairly prejudicial and, even then, only if the unfair prejudice substantially outweighs the probative value of the evidence.").

Based on the foregoing, the court denies claimants' motion to exclude the expert testimony of Prevost and evidence of Iko.

C.     Claimant's Motion to Exclude Furton (DE 216)

Claimants next seek to exclude Furton's testimony on the grounds that it does not fit the facts, and that Furton's testimony is unreliable. Furton principally opines that

> a positive alert to United States currency by a properly trained narcotics detection canine indicates that the currency has recently, or just prior to packaging, been in close or actual proximity to a significant amount of narcotics, and is not the result of any alleged innocent environmental contamination of circulated United States currency by microscopic traces of cocaine.

(Furton Report (DE 216-6) at 1).

Turning first to reliability, Furton obtained his doctorate in analytical chemistry in 1986 and has worked as a faculty member in Florida International University's Department of Chemistry and Biochemistry since 1988. (Furton Report (DE 216-6) at 1). He has taught numerous classes, received awards, and maintained affiliations with professional organizations in chemistry and forensic analysis. (Furton Report (DE 216-6) at 1-2). Furton's qualifications dovetail neatly with the subject matter at hand. He has conducted experimental research on, and has published more than 30 papers about, the chemical basis of canine detection to forensic specimens since 1993. (See Furton Report (DE 216-6) at 2-9). He has also helped coordinate Florida's detector dog training and certification program since 1998, served as a panelist on the National Academy of Science Group "Biotechnology Applications for Improving the Detection Capabilities of Canines" in 2003, chaired the Scientific Working Group on Dog and Orthogonal detector Guidelines (SWGDOG) since 2004,[6] and led the Organization of Scientific Area Committees (OSAC) Dog and Sensors subdivision. (Furton Report (DE 216-6) at 2). SWGDOG and OSAC both develop standards and guidelines for use of detection dogs. (See Furton Report (DE 216-6) at 2). Consequently, Furton has more than sufficient specialized knowledge and education to testify as an expert on the chemistry and forensic science underlying a canine's ability to detect the presence of drugs by smell.

---

[6] The United States Supreme Court cited Furton's work with SWGDOG in Harris to support its conclusion that controlled testing environments are better than field performance records in assessing a drug detection dog's reliability. See 568 U.S. at 246 n.3.

Furton bases his opinions on his knowledge of scholarly literature concerning currency contamination, as well as the gold standard of scientific methodology: experimentation. For example, in a 1997 study, Furton performed tests using gas chromatography ("GC"), mass spectrometry ("MS"), and controlled field trials with 15 different drug detection dogs of varying breeds, ages and training regimes. (1997 Furton Study (DE 216-9) at 3). United States currency was spiked with successively increasing amounts of cocaine and various cocaine byproducts. (1997 Furton Study (DE 216-9) at 3). Furton placed the spiked currency in cardboard and steel boxes to prevent the dogs or their handlers from seeing the contents and instructed dog handlers to have their dogs sweep the room for controlled substances. (1997 Furton Study (DE 216-9) at 4). The result of the study was that none of the dogs alerted to byproducts other than methyl benzoate, and a majority did not react to large quantities of cocaine hydrochloride or cocaine base in the absence of such compound. (See 1997 Furton Study (DE 216-9) at 4-5). Reviewing the literature in the field, Furton concluded that the levels of cocaine tested were far greater than the average amount of cocaine reported for U.S. currency in circulation, and methyl benzoate had not been reported on circulated currency due to diffusion. (1997 Furton Study (DE 216-9) at 5; see also 1998 Furton Study (DE 216-8) at 5).

Furton conducted similar testing in a 2002 study. (See 2002 Furton Study (DE 216-7) at 3-5). Employing his experimental design, Furton again concluded that the only chemical tested which revealed a consistent response from detector dogs in controlled indoor field tests was methyl benzoate at a level of one to ten micrograms. (2002 Furton Study (DE 216-7) at 8). In outdoor field tests, the only chemical tested that elicited a consistent response was methyl benzoate at a consistent level of ten micrograms. (2002 Furton Study (DE 216-7) at 8). Using 90 minute headspace solid-phase microextraction ("SPME"), Furton determined "the cocaine-odor concentrations varied widely

16

with methyl benzoate from 0.010% to 0.036% (w/w) . . . approximately two orders of magnitude higher than that observed for pharmaceutical-grade cocaine with methyl benzoate ranging from 0.00010% to 0.000096%." (2002 Furton Study (DE 216-7) at 7). Furton's 2002 study concludes that, based on studies reporting the amount of cocaine in circulated currency, a properly trained drug detector dog would not alert to "innocently contaminated currency." (2002 Furton Study (DE 216-7) at 9).

The studies described by the court are merely the tip of the iceberg. Furton states that "[m]y research has included studies of dozens of different narcotics detection canines and their abilities to detect the odor of cocaine involving hundreds of field tests." (Furton Report (DE 216-6) at 11).

Applying the Crisp factors, Furton's methodology meets the Daubert threshold for reliability. His theory that innocent contamination cannot be an explanation for drug detection dog alerts has been tested through experimentation. (See, e.g. 1997 Furton Study (DE 216-9); 2002 Furton Study (DE 216-7)). His studies on drug detection dog alerts have been peer reviewed and published. (E.g., 2002 Furton Study (DE 216-7); 2003 Furton Study (DE 239-1)). Moreover, his studies consider error rates in chemical analysis and control potential confounding variables. (See, e.g., 1997 Furton Study (DE 216-9) at 3-4; 2002 Furton Study (DE 216-7) at 3-5). Even claimants' own expert, Jay M. Poupko ("Poupko"), recognizes Furton's studies as part of the "Scientific Literature on Drug Contamination." (See Critical Review (DE 216-4) at 1, 4, 5). Whatever Poupko may think of Furton's findings and conclusions, his own published work implicitly demonstrates that Furton's studies are noteworthy contributions to the field of forensic science.

"Daubert's design is to 'make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" In re Lipitor (Atorvastatin

Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No II) MDL 2502, 892 F.3d 624, 631 (4th Cir. 2018).  Furton's qualifications and methods assure the court that he meets this standard.

In an attempt to impeach Furton's expert opinion before trial, claimants attempt to cast doubt on the findings and conclusions of his studies by challenging certain facts, including 1) the number of micrograms of cocaine hydrochloride present on a bill of U.S. currency, 2) that methyl benzoate is the primary odor detected by drug detection dogs, 3) that stacking bills together may cause a drug detection dog to alert even where one bill would not have sufficient amount of cocaine to individually cause an alert, 4) that pure cocaine does not appear on currency in the general population, 5) that methyl benzoate does not dissipate, and 6) that Furton has frequently testified as a government expert.  (See Cl. Mem. (DE 216) at 13-26).  Such arguments certainly make ideal fodder for cross-examination and presentation of contrary evidence.  See Daubert, 509 U.S. at 596. However, for the reasons discussed above, claimants challenge the weight, rather than the admissibility of Furton as an expert, given his qualifications and the reliability of methods used to support his opinions in this case.

Turning to the law, claimants argue that this case is analogous to Cooper.  In Cooper, the Fourth Circuit considered exclusion of a doctor's expert testimony based on "differential diagnosis," a technique where doctors identify "the possible causes for the patient's symptoms and then eliminat[e] each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is most likely." 259 F.3d at 200.  Mitchell, the doctor, testified that a pedicle screw device caused a nonunion in a spinal fusion surgery because the screw was defective.  Id. at 200–01.  After identifying numerous possible causes for the nonunion that the Mitchell failed to consider in his differential diagnosis, the court concluded "if an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause

18

was not the sole cause, a district court is justified in excluding the expert's testimony." Id. at 202. The Fourth Circuit also noted that Mitchell openly refused to consider relevant literature without explaining how he had ruled out other possible causes of injury, did not conduct a physical examination, and did not evaluate Cooper consistent with diagnostic methodology he employs in his own medical practice. Id. at 203.

Cooper is distinguishable from the instant case. Furton did not apply "differential diagnosis," but instead used experiments. As part of his experiments, he controlled for numerous factors that he believed could negate the validity of his findings, such as the ability of the handlers and their dogs to see the currency, variations in the traits of the drug detection dogs themselves, and the ambient conditions. (See, e.g., 1997 Furton Study (DE 216-9) at 3-4; 2002 Furton Study (DE 216-7) at 3-5). He also carefully calibrated his chemical analyses when evaluating the mass of compounds on currency. (See 2002 Furton Study (DE 216-7) at 3-5). Furton has considered other important factors such as the amount of cocaine present on currency by reviewing the literature in the field and determined that it does not undermine his conclusions given in his expert report. (See Furton Report (DE 216-6) at 10-12). Thus, Furton has not "utterly fail[ed] to consider alternative causes . . . ." Cooper, 259 F.3d at 202; see Lipitor, 892 F.3d at 632 ("[T]he court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct.").

Claimants also argue that the United States Court of Appeals for the Seventh Circuit "rejected" Furton's study in United States v. Funds in Amount of One Hundred Thousand One Hundred & Twenty Dollars ($100,120.00), 730 F.3d 711, 719–21 (7th Cir. 2013). In $100,120.00, the Seventh Circuit reversed the district court's order granting summary judgment to the government. Id. at 715, 727. There, the court considered Furton's studies, noting that claimant successfully offered expert testimony to rebut Furton's opinions, based in part on another scientific

study with conclusions different from that of Furton. Id. at 719–21. Ultimately, the court concluded claimant "created a dispute of material fact" regarding whether drug detection dog alerts to currency are reliable evidence that the currency recently has been in contact with illegal drugs. Id. at 721.

Claimants' reliance on $100,120.00 is misplaced. The Seventh Circuit's task in reviewing the district court's order was not to pass on the admissibility of Furton's testimony, but instead to decide whether the government was entitled to summary judgment, construing the facts in light most favorable to claimant and drawing all reasonable inferences in claimant's favor.[7] Id. at 716. In fact, the court expressly stated that "[b]ecause the district court did not address the admissibility of the expert evidence under Daubert and Rule 702, we will not do so in the first instance on appeal." Id. at 721 n.13. In this case, the court denied plaintiff's motion for summary judgment. (Order (DE 253)). Since $100,120.00 does not address the issue presently before the court, it is unpersuasive.

The only remaining question is whether Furton's opinion is relevant. To fit the facts of this case, Furton's opinion requires "a positive alert to United States currency by a properly trained narcotics detection canine." (See Furton Report (DE 216-6) at 10; 2002 Furton Study (DE 216-7) at 9; 1997 Furton Study (DE 216-9) at 5). Furton takes as fact that Prevost and Iko "acted consistently with their training" and that Iko positively alerted to the currency.[8] (See Furton Report (DE 216-6) at 12). To support his assumption, Furton relies upon materials in this case including officer statements and report of investigation, canine certifications and training reports, a dash camera video of the search of claimant A. Garcia's vehicle, and a telephone interview with Prevost.

---

[7] The appellate standard of review is also different for an order addressing summary judgment and an order addressing Daubert motions. Trana Discovery, Inc. v. S. Research Inst., 915 F.3d 249, 253 (4th Cir. 2019) ("We review the district court's grant of summary judgment de novo."); Nease v. Ford Motor Co., 848 F.3d 219, 228 (4th Cir. 2017) ("We review the district court's application of Daubert for abuse of discretion.").

[8] Claimants argue that because Furton states that Iko "alerted to the currency inside the laundry basket," his opinion does not fit the facts of this case.

(Furton Report (DE 216-6) at 9). Furton may reasonably rely on Prevost's opinion, together with the other case materials, to assume Iko was properly trained and alerted to drugs. Furton's opinion fits the facts of the case, and is therefore relevant. His expert testimony meets the admissibility requirements under Rule 702.

For similar reasons, Furton's testimony is admissible under Rule 403. The testimony has considerable probative value for the purpose of rebutting the theory that the currency is innocently contaminated. Claimants have failed to articulate any unfair prejudice or other salient reason that substantially outweighs the probative value of Furton's testimony. See Fed. R. Evid. 403. Therefore, the court overrules claimants' objection under Rule 403. Furton will be received as an expert at trial.

D.      Plaintiff's Motion to Exclude Lecci (DE 240)

The district court must exclude "expert testimony related to matters which are obviously ... within the common knowledge of jurors." United States v. Fuertes, 805 F.3d 485, 495 (4th Cir. 2015) (quoting United States v. Lespier, 725 F.3d 437, 449 (4th Cir. 2013)); United States v. Allen, 716 F.3d 98, 105–06 (4th Cir. 2013); United States v. Dorsey, 45 F.3d 809, 814 (4th Cir. 1995). As such, it is generally true that "an opinion on the credibility of a witness by a [psychologist] is not allowable." United States v. Cecil, 836 F.2d 1431, 1442 (4th Cir. 1988) (en banc); Lespier, 725 F.3d at 449. The court has recognized a "narrow exception to this general rule" for expert testimony explaining problems with eyewitness identification, including "cross-racial identification, identification after a long delay, identification after observation under stress, . . . the feedback factor[,] and unconscious transference." Lespier, 725 F.3d at 449 (holding the effects of sleep deprivation to be readily comprehended by the jury); United States v. Harris, 995 F.2d 532, 534–36 (4th Cir. 1993). However, the Fourth Circuit has repeatedly admonished that "deficiencies or

inconsistencies in an eyewitness's testimony can be brought out with skillful cross-examination." Moore v. Hardee, 723 F.3d 488, 498 (4th Cir. 2013) (internal citation omitted); United States v. Davis, 690 F.3d 226, 257 (4th Cir. 2012) (internal citation omitted).

Lecci's proffered testimony goes to only one issue before the jury: the credibility of Bohne, one of plaintiff's witnesses who will testify claimant A. Garcia dealt him drugs. The first line of Lecci's expert report states "[t]he purpose of this report is to opine on [Bohne's] psychiatric diagnoses and how these diagnoses may impact his ability and willingness to provide credible testimony." (Lecci Report (DE 241-2) at 1 (emphasis added)). Lecci observes "[w]hat is also strongly supported by the deposition, is [Bohne's] willingness to act in a manner that will serve his best interests, whether that be to provide false statements to law enforcement or to fabricate psychiatric symptoms . . . ." (Lecci Report (DE 241-2) at 4). In the final paragraph of Lecci's report, he states "Bohne's testimony should be taken with considerable skepticism, especially in the absence of any corroborating information." (Lecci Report (DE 241-2) at 5).

Lecci's deposition testimony even more clearly frames the issue of credibility. He testifies "does [Bohne] have the potential to give correct information? Yes . . . . The hard part is for people to know when he is. So having corroborating information would be really important." (Lecci Dep. (DE 241-3) 7:25-8:4). Lecci opines that people with antisocial personality disorder "are typically quite good at lying" and that he would "want corroboratory information" rather than taking that person's word as true. (Lecci Dep. (DE 241-3) 13:5-7, 14:3-4, 15:11-12). Finally, Lecci testifies that Bohne's ability to accurately recall events might be impaired by frequent substance abuse. (See Lecci Dep. (DE 241-3) 36:11-13, 41:2-4, 42:19-24, 43:11-22).

A jury does not need an explanation of antisocial personality disorder to understand Bohne's alleged pattern of false statements. (See Lecci Report (DE 241-2) at 4 (discussing various forms of

lying, such as providing false statements to law enforcement or fabricating psychological symptoms)). Similarly, it is within the common knowledge of the jury that substance abuse may impair an individual's recollection of events. Claimants may question Bohne's veracity through rigorous cross-examination, and they may use other impeachment techniques as provided by the Federal Rules of Evidence. However, the court adheres to the general rule that expert testimony is not the lens through which the jury should view credibility. See Cecil, 836 F.2d at 1442; Lespier, 725 F.3d at 449.

Claimants argue that Lecci's opinion goes to Bohne's competency to testify as a witness. (See Resp. Opp. (DE 249) at 1, 6-10). Thus, they reason, Lecci's opinion properly may be submitted to the jury, even though its straddles credibility and competency. (See Resp. Opp. (DE 249) at 17 (quoting Lecci Dep. (DE 241-3) 13:18-15:11)). Claimants conflate credibility, an issue of fact, with competency, a question of law.

"The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a). "The question of the competency of a witness is for the [c]ourt, not the jury. If the competency of a witness is challenged before testifying, it is the duty of the [c]ourt to make such examination as will satisfy it of the competency or incompetency of the witness." United States v. Odom, 736 F.2d 104, 111 (4th Cir. 1984).

Lecci's testimony as to Bohne's competency may be used in support of a motion to disqualify Bohne as a witness. See Fed. R. Evid. 104(a). Such motion is not presently before the court. The court presently must decide under Daubert if Lecci's testimony is admissible evidence at trial. Since the jury has no role in determining competency, Lecci's opinions as to Bohne's competency are also unhelpful to the trier of fact. See Ancient Coin Collectors Guild, 899 F.3d at

318. Consequently, the court grants plaintiff's motion and excludes Lecci's testimony from presentation to the jury at trial.

## CONCLUSION

Based on the foregoing, claimants' motion to exclude Prevost and evidence pertaining to his drug detection dog (DE 215) is DENIED. Claimant's motion to exclude Furton (DE 216) is DENIED. Plaintiff's motion to exclude Lecci (DE 240) is GRANTED.

SO ORDERED, this the 20th day of May, 2019.


LOUISE W. FLANAGAN
United States District Judge