IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:12-CV-136-FL

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | |
| | ) | ORDER |
| $307,970.00 IN U.S. CURRENCY, | ) | |
| Defendant, | ) | |
| APOLINAR GARCIA-ANCELMO, CIRILA PINEDA GARCIA, and LUCIA COVARRUBIAS, | ) | |
| Claimants. | ) | |

This matter comes before the court on claimants' motion in limine to exclude evidence due to spoliation, or in the alternative a request for spoliation jury instruction (DE 260). Also before the court is claimants' motion in limine to exclude testimony by Thurman Bohne ("Bohne") and request for hearing to assess competency (DE 275). The issues raised are ripe for ruling. For the reasons that follow, claimants' motion for sanctions due to spoliation is granted in part and denied in part. Claimants' motion to exclude testimony by Bohne is denied.

**BACKGROUND**

This matter, set for trial commencing October 21, 2019, concerns whether $307,970.00 in United States currency seized from claimant Apolinar Garcia-Ancelmo ("Garcia-Ancelmo") during a traffic stop was used or intended to be used in exchange for controlled substances, represented proceeds of trafficking in controlled substances, or was used or intended to be used to facilitate a violation of Title II of the Controlled Substances Act, 21 U.S.C. §§ 801 et seq. Where this case has

a complex procedural history and lengthy factual background, the court recounts the following facts and procedure pertinent to the issues now under consideration.

A.     The Currency

Claimant Garcia-Ancelmo met with an undercover drug interdiction officer, Special Agent Gilbert Trillo ("Trillo"), in order arrange transport of the currency to Mexico. While driving to deliver the currency to Trillo on February 16, 2012, claimant Garcia-Ancelmo was stopped by FBI Task Force Officer Matthew Miller ("Miller"), then investigating claimant Garcia-Ancelmo. Miller allegedly observed claimant Garcia-Ancelmo commit traffic violations, and initiated a traffic stop. During the traffic stop, Miller asked for and received consent to search claimant Garcia-Ancelmo's car.[1] Upon searching the car, Miller discovered the currency buried under a pile of laundry in a bin, concealed within two black trash bags and packaged in vacuum-sealed plastic bags.

Following Miller's discovery of the currency in claimant Garcia-Ancelmo's car, Officer Kenneth Prevost ("Prevost") and police canine Iko arrived at the scene to conduct a sniff for drugs. According to Prevost, Iko alerted to drugs on the currency. Thereafter, Miller explained to claimant Garcia-Ancelmo that the money would be seized and he would be given a property receipt and then released. Miller's report of investigation makes no mention of Prevost and Iko's search of the car, though Miller observed the search and the search was recorded on dash camera video.

Shortly after seizing the currency, Miller and another deputy sheriff transported the currency back to the Wayne County Sheriff's Office ("WCSO") Annex, where the currency was turned over to Drug Enforcement Administration ("DEA") agent Nicholas J. Giacobbe

---

[1] The court notes that, at summary judgment, the parties did not dispute that the car in fact was registered to claimant Covarrubias. However, since claimant A. Garcia was the one stopped by Miller, the court refers to the car as claimant A. Garcia's vehicle.

("Giacobbe"). The currency was photographed by Giacobbe and Trillo, transported from the WCSO Annex to the DEA's Wilmington Regional Office ("WRO"), and secured in an overnight high value storage safe. On February 17, 2012, the currency was taken by other DEA agents to RBC Bank, Princess Street, Wilmington, NC, and converted into a cashier's check. Trillo and Giacobbe's reports of investigation do not mention the drug dog search of claimant Garcia-Ancelmo's car.

In June 2017, the government reviewed the dash camera footage of the traffic stop and discovered that a drug dog search had been conducted. After conferring with Miller, the government was able to confirm Prevost's identity and amended its discovery disclosures to say that they intended to offer evidence of the drug dog search. Claimants sought discovery sanctions, asking the court to exclude evidence of the drug dog search for failing to timely disclose the evidence. The court denied the motion, finding the government timely disclosed the information, and that in any event the evidence should be permitted at trial. The court also denied claimants' motion to exclude expert testimony of Prevost and Dr. Kenneth Furton ("Furton") that Iko alerted to drugs recently in contact with defendant currency, pursuant to Federal Rules of Evidence 403, 702, and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).

B.     Interviews and Testimony of Thurman Bohne

The government does not rely solely on contamination of the currency to support its argument that the currency is substantially connected to drug trafficking. They also rely on witnesses that testify claimants gave them drugs. One of those witnesses is Thurman Bohne ("Bohne"). Bohne testifies that, from the beginning of 2010 to the middle of 2012, he received significant quantities of cocaine from claimant Garcia-Ancelmo and other members of his family.

Claimants seek to preclude Bohne's testimony. First, they argue that the government

despoiled evidence used in Bohne's interviews, including a list containing the names of individuals who sold Bohne drugs, and photographs used by the government to confirm that Bohne was referring to claimants. Claimants argue such purported spoliation requires exclusion of any identification testimony by Bohne. Second, they challenge Bohne's competency. Relying on the expert opinions of Dr. Len Lecci ("Lecci") and Dr. Heather Ross ("Ross"), claimants argue that Bohne's substance abuse and Antisocial Personality Disorder bar him from testifying at trial.

## DISCUSSION

A.  Claimants' Motion for Spoliation Sanctions (DE 260)

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."[2] Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001). "The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct 'which abuses the judicial process.'" Id. (quoting Chambers v. NASCO, Inc., 501 U.S. 32, 45–46 (1991)). "[S]poliation does not result merely from the 'negligent loss or destruction of evidence.'" Turner v. United States, 736 F.3d 274, 282 (4th Cir. 2013) (quoting Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995)). "Rather, the alleged destroyer must have known that the evidence was relevant to some issue in the anticipated case, and thereafter willfully engaged in conduct resulting in the evidence's loss or destruction." Turner, 736 F.3d at 282; Vulcan Materials Co. v. Massiah, 645 F.3d 249, 259–60 (4th Cir. 2011); Hodge v. Wal-Mart Stores, Inc., 360 F.3d 446, 450 (4th Cir. 2004). "Although the

---

[2] Here, litigation was reasonably foreseeable because Miller explained to claimant Garcia-Ancelmo that the currency was being seized and that claimant Garcia-Ancelmo was being given a property receipt. (Miller Decl. (DE 220-2) ¶ 13).

4

conduct must be intentional, the party seeking sanctions need not prove bad faith." Turner, 736 F.3d at 282 (citing Vodusek, 71 F.3d at 156); see Cole v. Keller Indus., Inc., 132 F.3d 1044, 1046–47 (4th Cir. 1998).

1. The Currency

To manage funds seized by the government in forfeiture proceedings, Congress created the Asset Forfeiture Fund, as well as holding accounts associated with the Asset Forfeiture Fund. See 28 U.S.C. § 524(c). Pursuant to applicable regulations, "[s]eized U.S. currency . . . must be deposited promptly in the Seized Asset Deposit Fund pending forfeiture." 28 C.F.R. § 8.5(b). For the government to be provisionally relieved of the obligation to comply with this mandate, the Chief of the Asset Forfeiture and Money Laundering Section (AFMLS) must first "determine[] in writing that the currency is reasonably likely to serve a significant, independent, tangible evidentiary purpose." 28 C.F.R. § 8.5(b)(2).

On February 16, 2012, government agents seized $307,970.00 from claimant Garcia-Ancelmo after observing the cash was packaged in a manner consistent with drug trafficking, in a quantity consistent with drug trafficking, and after having Iko, a narcotics detection canine, conduct a sniff of the car. The evidence was turned over to agents with the DEA, who photographed the currency for evidence. (See Currency Photos (DE 235-4)). The currency was held in an overnight high value storage safe, and converted into a cashier's check on February 17, 2012. (February 17, 2012 ROI (DE 261-1) at 9). The government's deposit of the currency is plainly intentional, as it was done according to DOJ regulations and guidance. See 28 C.F.R. § 8.5(b) (mandating prompt deposit of currency); (February 17, 2012 ROI (DE 261-1) at 9).

Moreover, the government should have known that the currency was potentially relevant

evidence for testing contamination. See 28 C.F.R. § 8.5(c) ("Seized currency has a significant independent, tangible evidentiary purpose" if, for example, it "contains a traceable amount of narcotic residue or some other substance of evidentiary significance."); United States v. Funds in Amount of One Hundred Thousand One Hundred & Twenty Dollars ($100,120.00), 730 F.3d 711, 720 n.1 (7th Cir. 2013) ("By failing to perform such testing (and failing to preserve the Funds until the conclusion of this proceeding), the government eliminated laboratory testing as a source of evidence."). Miller observed Prevost and Iko conduct a drug dog sniff of the car. (Miller ROI (DE 196-2) at 13–16). Additionally, the dash camera recorded the purported drug dog sniff. (See Dash Camera Video (DE 215-11) 26:07–27:46).[3] This should have put the government on notice that contamination of currency was a relevant issue in the case, making testing of the currency relevant to an innocent contamination defense. Instead, the reports of investigation in this case indicate that the DEA agents responsible for depositing the currency did not know that contamination of the currency was an issue in this case. (See Feb. 17, 2012 ROI (DE 261-1) at 1–9 (failing to discuss the drug dog test conducted by Prevost and Iko)). Thus, the court in its discretion will consider an appropriate sanction to cure the prejudice to claimants arising from this apparent miscommunication among law enforcement agents.

When determining an appropriate sanction for spoliation, "the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." Silvestri v. Gen. Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001) (internal citation omitted). "In addition, a court must find some degree of fault to impose sanctions." Id. "The trial court has discretion to pursue a wide range of responses both for the purpose of leveling the

---

[3] All citations herein to this dash camera video are to the time stamp in minutes and seconds (for example, "00:00") appearing in the player on which the court viewed the videos, VLC Media Player.

evidentiary playing field and for the purpose of sanctioning the improper conduct." Vodusek, 71 F.3d at 156.

Under these circumstances, a permissive adverse inference instruction is a remedy that is fair to both the government and claimants. The instruction leaves ultimate determination of the facts to the jury, who will be able to base their assessment of the parties' contamination theories on the extensive testimony forecasted for trial. However, a permissive instruction also punishes the government for eliminating evidence relevant to claimants' defense due to its failure to appreciate the potential relevance of the currency to the dog sniff it conducted. In addition, claimants may question the government's agents regarding why they failed to preserve the currency in this case.

Claimants ask the court to exclude the government's evidence of Iko and expert testimony, or alternatively for a mandatory adverse inference instruction. The court declines to impose those sanctions where they are excessively punitive on the facts of this case. Claimants are still able to effectively raise their innocent contamination defense by cross-examination and relying on their own expert witnesses to attack the reliability of Iko's alleged alert, which is the government's only basis for alleging the currency was contaminated with cocaine at the time of the seizure. Moreover, the agents' failure to realize contamination was an issue in the case supports an inference that the government acted "in good faith and accord with their normal practice" of avoiding "[t]he security, budgetary, and accounting problems caused by retention of large amounts of cash." United States v. $433,980 in U.S. Currency, 473 F. Supp. 2d 672, 683 (E.D.N.C. 2006) (quoting Arizona v. Youngblood, 488 U.S. 51, 56 (1988)); U.S. Department of Justice, Asset Forfeiture Policy Manual 58 (2019), available at https://www.justice.gov/criminal-afmls/file/839521/download

7

[https://perma.cc/7Z2E-5QWD]. Under these circumstances, the court leaves to the factfinder the ultimate determination of whether an adverse inference is warranted.

  2. Bohne's List of Suppliers

During the interview with government agents, Bohne asked his then-girlfriend Jackie Rodriguez-Acosta[4] to provide him with a handwritten list of names of persons he claimed were involved in drug trafficking with claimants. (See Bohne Dep. (DE 261-3) 37:18–39:8). Bohne took the list to his interview with government agents, and the agents "used their own paper and they wrote down the names and everything, who I was telling them about." (Bohne Dep. (DE 269-2) 39:12–18; see July 2, 2015 Report of Investigation ("ROI") (DE 269-3) at 3–4). Although the government agents wrote down a copy of the list, Bohne kept the original list. (See Bohne Dep. (DE 269-2) 39:19–25). When asked by claimants' counsel, Bohne testified that he mailed the list home to his family, and the list was placed in his safe. (See Bohne Dep. (DE 269-2) 71:8–72:19).

The only possible basis that claimants have for arguing spoliation is the suggestion by Bohne that government agents "[took] a picture" or "made a copy" of the list. (Bohne Dep. (DE 269-2) 39:19–22). The government denies having a photograph or other duplicate of Bohne's list, aside from the copy of the list transcribed in the July 2, 2015 ROI by task force officer Jason Corprew ("Corprew"). (See Gov. Resp. (DE 269) at 6 n.2). That report has been made available to claimants. (See July 2, 2015 ROI (DE 269-3) at 3–4). Even assuming the government did willfully create and destroy a photograph of photocopy of Bohne's list however, claimants have not shown that the list was lost or destroyed.

Bohne's original list was never property in the possession of the government. See Hodge,

---

  [4] Jackie Rodriguez is the sister of Hilaria Rodriguez, another government witness.

360 F.3d at 450–51 n.1. If claimants were dissatisfied with the accuracy of the July 2, 2015, ROI produced by the government, at any time following deposition of Bohne they could have subpoenaed the original list of individuals. (See Bohne Dep. (DE 269-2) 71:8–72:19 (giving claimants' counsel the requisite names, address, and location for finding the list)). Claimants declined to do so. Claimants argue that the subjects of the subpoena "certainly would have refused to comply," relying on the court to assume the result of a process they never initiated. (Cl. Reply (DE 274) at 12). Since claimants failed to use process available to them to obtain the original list, which Bohne testified was preserved in a safe place for his own protection, the court will not sanction the government for loss or destruction of evidence. See Silvestri, 271 F.3d at 590 (holding sanctions for spoliation appropriate only to curb abuses of the judicial process).

    3.    Interview Photographs

As discussed above, at an interview on July 2, 2015, Bohne identified claimants Garcia-Ancelmo, Cirila Garcia, Ofelio Garcia, and Felipe Garcia (among others) as drug traffickers. (See July 2, 2015 ROI (DE 269-3) at 3–4). The following month, officer Brian Fleming ("Fleming") went with Corprew to debrief Bohne. (Fleming Dep. (DE 269-4) 31:4–7). As part of the debriefing, he brought pictures of claimant Garcia-Ancelmo, claimant Cirila Garcia, Ofelio Garcia, Felipe Garcia, other photos associated with their address and a google maps picture of the house claimant Garcia-Ancelmo lived in. (Fleming Dep. (DE 269-4) 31:10–14, 31:21–32:1; see Bohne Dep. (DE 269-2) 49:4–13). The government agents put the photos in front of Bohne and asked him if he knew the person. (Fleming Dep. (DE 269-4) 32:9–25). Bohne was not told by the officers who was going to be in the photos he was shown; he identified the individuals in the photos as Stantonsburg, his wife, and his son, but was unable to conclusively identify Felipe Garcia, Stantonsburg's partner.

9

(Bohne Dep. (DE 261-3, DE 269-2) 50:12–51:22). Bohne referred to claimant Garcia-Ancelmo as Stantonsburg. (See Bohne Dep. (DE 220-8) 42:23–43:18; Fleming Dep. (DE 269-4) 32:18–25).

The only evidence that claimants raise to advance their spoliation argument is that the government failed to produce the photos for claimants. (Cl. Brief (DE 261) at 5). However, a finding of spoliation requires loss or destruction of evidence that is willful, as opposed to merely negligent. Turner, 736 F.3d at 282. Where claimants fail to show the government willfully lost or destroyed the photographs used in Bohne's interview, a sanction for spoliation is not appropriate.[5]

B.      Claimants' Motion to Exclude Testimony by Thurman Bohne (DE 275)

"The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a). "The question of the competence of the witness . . . [is] for the [c]ourt and not for the jury." United States v. Barnes, 368 F.2d 567, 568 (4th Cir. 1966). "If the competency of a witness is challenged before testifying, it is the duty of the [c]ourt to make such examination as will satisfy it of the competency or incompetency of the witness." United States v. Odom, 736 F.2d 104, 111 (4th Cir. 1984). "[T]here is no requirement for an in camera preliminary hearing on the competency of witnesses." Id.

"Every witness is presumed competent to testify, . . . unless it can be shown that the witness does not have personal knowledge of the matters about which he is to testify, that he does not have the capacity to recall, or that he does not understand the duty to testify truthfully." United States

---

[5] Claimants raise for the first time in their reply brief a challenge under the due process clause, suggesting Bohne's identification testimony, both in court and at his debriefing, should not be allowed because using photographs to visually identify claimants was impermissibly suggestive. (Cl. Reply (DE 274) at 10–11 (citing Manson v. Brathwaite, 432 U.S. 98 (1977)). As this issue has not been fully briefed, and as claimants requested relief on grounds of spoliation, claimants must raise their due process challenge in a separate motion in limine.

v. Lightly, 677 F.2d 1027, 1028 (4th Cir. 1982) (citing Fed. R. Evid. 601); see also Fed. R. Evid. 602, 603. As the United States Court of Appeals for the Fourth Circuit succinctly put it, "[i]t is better to let the witnesses be heard and trust the practical sagacity of the jurors who have been made fully aware of their informants' shortcomings." Schoppel v. United States, 270 F.2d 413, 416 (4th Cir. 1959).

Claimants argue that Bohne is incompetent to testify that claimant Garcia-Ancelmo and his son supplied him with drugs from 2010–2012. Relying heavily on the opinion of Dr. Len Lecci ("Lecci"), claimants assert Bohne lacks personal knowledge because he frequently used drugs, and is unable tell the truth because he has been diagnosed with antisocial personality disorder. (See Lecci Suppl. Decl. (DE 276-1) ¶¶ 3, 4). The court addresses each of these claims in turn.

1. Bohne's Substance Abuse

"The fact that a witness is a narcotics user goes not to his competency, but to his credibility." United States v. Jackson, 576 F.2d 46, 48 (5th Cir. 1978); United States v. Sinclair, 109 F.3d 1527, 1536–37 (10th Cir. 1997); United States v. Ramirez, 871 F.2d 582, 583–84 (6th Cir. 1989); United States v. Parker, 428 F.2d 488, 491 (9th Cir. 1970); see United States v. Rockwell, 38 F. App'x 859, 860 (4th Cir. 2002) (discussing issues relevant to determining the credibility of a witness). In United States v. Killian, the United States Court of Appeals for the Fifth Circuit considered whether a witness "was incompetent because of being a user of some nature of drugs." 524 F.2d 1268, 1275 (5th Cir. 1975). There, the court found that, while the witness "was a heavy user of drugs and that he suffered from time to time from hallucinations," his testimony was nonetheless admissible because the witness "testified at the trial that he had not been under the influence of drugs for several days." Id.

Bohne testifies that, from the beginning of 2010 to the middle of 2012, he sold approximately 150 kilograms of cocaine. (Bohne Dep. (DE 220-8) 91:9–19). The source of the cocaine was claimant Garcia-Ancelmo's son in Mexico and his partner. (Bohne Dep. (DE 220-8) 92:14–23). Approximately every four to six weeks the course of the year, he allegedly took drugs from claimants' house and brought money to claimants' house. (See Bohne Dep. (DE 220-8) 95:3–96:13).

Regarding his substance abuse, Bohne testifies that, due to hallucinations induced by drug usage, he "had several times where [he] couldn't clarify what was going on, maybe middle 2010." (Bohne Dep. (DE 276-2) 75:2–8). Specifically, he mixed cocaine, percocet, and methadone, inducing hallucinations that, at that time, preventing him from telling the difference between what was real and what was not real. (Bohne Dep. (DE 276-2) 74:17–20, 77:4–78:2). However, Bohne also testified that mixing these drugs "wasn't an everyday thing." (Bohne Dep. (DE 276-2) 77:10). According to him, his ability to tell the difference between what was real and not real would diminish "after being up three or four days at a time." (Bohne Dep. (DE 276-2) 77:20–21).

Lecci opines that Bohne's substance abuse "would negatively impact [his] ability to properly perceive information at the time it occurred." (Lecci Suppl. Decl. (DE 276-1) ¶ 3). However, Lecci's deposition testimony markedly qualifies this opinion. He repeatedly notes that the extent and frequency of drug use affects how many lucid periods there are when experiencing drug induced psychosis. (See Lecci Dep. (DE 249-4) 41:6–11, 42:19–25, 45:12–46:6). When asked if a person can have periods within an overall psychotic episode where the person would be lucid enough to recall information, Lecci stated: "psychotic experiences are more intermittent. If it's like a typical experience, it would be more intermittent versus constant. That would be more typical. So of

12

course, you would have some periods of greater lucidity and less lucidity." (Lecci Dep. (DE 249-4) 51:2–6). Lecci also emphasized that it is not possible for him to definitively say whether a particular memory is a hallucination or real. (Lecci Dep. (DE 249-4) 71:16–21).

Dr. Heather Ross' ("Ross") testimony was even more circumspect, saying only that Bohne's "ability to perceive and recall events accurately <u>could</u> be affected by his drug use; further, this would be potentially pertinent only to the period in which he was actively abusing substances and experiencing psychotic symptoms." (Ross Dep. Cl. Ex. 1 (DE 234-6) at 27 (emphasis in original)). Furthermore, Ross opined that "[n]o diagnosis I offered is indicative that [] Bohne cannot offer reliable information." (Ross Dep. Cl. Ex. 1 (DE 234-6) at 28).

In light of applicable law and the facts in the record, Bohne's substance abuse does not rebut the presumption under the Federal Rules of Evidence that he is competent to testify. Bohne testified that, for a period of almost two and a half years, claimant Garcia-Ancelmo and his son supplied him with drugs to sell every several weeks. Bohne's testimony is evidence of his personal knowledge. <u>See</u> Fed. R. Evid. 602. Claimants' position rests on the argument that Bohne was constantly hallucinating for the entirety of the relevant two and a half year period. However, as claimants' own expert testified, such episodes are typically more intermittent than constant, the impact of the drugs in any case varies by extent and usage, and the effect of hallucinations on any one of Bohne's particular memories is uncertain. To conclude that Bohne has no personal knowledge of an entire two and a half year period because of substance abuse is an extraordinary finding, which the court refuses to make on the facts presented. Claimants must advance their position by impeaching Bohne.

2. Bohne's Antisocial Personality Disorder

13

A witness may be found incompetent where they do not understand the duty to testify truthfully. Lightly, 677 F.2d at 1028. A witness fails to understand this duty where he or she is unable to distinguish a truth from a lie, or is unable to uphold the oath to give truthful testimony in court. See Kentucky v. Stincer, 482 U.S. 730, 733 (1987). Merely pointing to a record of prior false or inconsistent statements goes to a witness' credibility, rather than competency. See Schoppel, 270 F.2d at 416 ("Even a convicted perjurer may competently testify in a Federal Court."); United States v. Bedonie, 913 F.2d 782, 799–801 (10th Cir. 1990) ("The jury system has served us well. We would not serve it well by holding that jurors are incapable of making credibility determinations.").

Ross diagnosed Bohne with Antisocial Personality Disorder, marked by pathological personality traits including deceitfulness and manipulativeness. (See Lecci Supp. Decl. (DE 276-1) ¶ 4). Lecci opines that "[g]iven the tendency not to be truthful, especially when he has something to gain, there would be little to (internally) motivate the individual to be truthful if doing so would not be in his best interest." (Lecci Supp. Decl. (DE 276-1) ¶ 4).

The record does not support claimants' argument that Bohne's Antisocial Personality Disorder prevents him from distinguishing a truth from a lie, or giving truthful information. Lecci testified that, for people with Antisocial Personality Disorder, it "would be very unusual that they wouldn't understand what the difference is." (Lecci Dep. (DE 249-4) 68:4–15). In Bohne's case, he admitted to lying about having hallucinations to obtain a downward departure on his sentence.[6] (Bohne Dep. (DE 276-2) 80:10–81:10, 81:23–82:5, 82:11–20). Ross noted in her interview with Bohne that he "provided some information that was corroborated by records, suggesting he was able

---

[6] False testimony under oath exposes a witness to potential criminal liability for perjury. See 18 U.S.C. § 1623(a). As Bohne has apparently taken an interest in minimizing his time spent in prison, the court has sufficient reason to believe he understands the obligation to testify truthfully.

to be truthful in his reporting." (Ross Dep. Cl. Ex. 1 (DE 234-6) at 28). As noted above, Ross also opined that "[n]o diagnosis I offered is indicative that [] Bohne cannot offer reliable information." (Ross Dep. Cl. Ex. 1 (DE 234-6) at 28). While Bohne's admissions are ideal fodder for cross-examination, they are insufficient to deem him incompetent.

Claimants argue that the court should hold a hearing to determine whether Bohne is competent to testify as a witness. On the record before it, the court concludes hearing as to Bohne's competency is not necessary. See Odom, 736 F.2d at 111. Claimants also argue that Bohne's testimony is false because it is inconsistent with that of other witnesses. Claimants may advance this argument through traditional means of impeachment. See Odom, 736 F.2d at 112; Schoppel, 270 F.2d at 416. Claimants' motion to exclude Bohne's testimony is denied.

## CONCLUSION

Based on the foregoing, claimants' motion to exclude evidence due to spoliation or alternative request for spoliation jury instruction (DE 260) is GRANTED IN PART. The court will give a permissive adverse inference instruction, and will allow claimants to question why the government converted defendant currency into a check. Claimants' motion is DENIED IN REMAINING PART. Claimants' motion to exclude witness testimony by Thurman Bohne and request for hearing to assess competency (DE 275) is DENIED.

SO ORDERED, this the 13th day of September, 2019.

_____
LOUISE W. FLANAGAN
United States District Judge